EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alexandra M. Andino Torres | Certiorari |
| Ex-Parte | 2000 TSPR 109 |

Número del Caso: CC-1997-0639

Fecha: 30/06/2000

Tribunal de Circuito de Apelaciones: Circuito Regional III

Juez Ponente: Hon. Igrí Rivera de Martínez

Abogado de la Parte Peticionaria:

Lcdo. Luis Arturo Sánchez Rodríguez

Oficina del Procurador General:

Lcda. Sylvia Cancio Bigas
Procuradora General Auxiliar

Materia: Cambio de Nombre

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexandra M. Andino Torres

    Ex-parte                     CC-97-639      Certiorari

SENTENCIA

San Juan, Puerto Rico, a 30 de junio de 2000

I

El ser humano Andino Torres, nació como varón en 1950 y se inscribió en el Registro Demográfico bajo el nombre de **Andrés** Andino Torres. En 1995 presentó ante el Tribunal de Primera Instancia, Subsección de Manatí, petición solicitando el cambio de nombre y sexo en su certificado de nacimiento. Alegó que en 1976 se sometió a una cirugía mediante la cual se cambió el sexo y desde entonces se conducía y comportaba como mujer, bajo el nombre de **Alexandra** Andino Torres.

Instancia mediante sentencia de 17 de diciembre de 1996, ordenó al Registro Demográfico el cambio de nombre a Andino Torres, pero denegó la solicitud

de cambio de sexo bajo el fundamento de que no estaba permitido por la Ley del Registro Demográfico. Ante una reconsideración y Solicitud de Determinaciones de Hechos Adicionales y Conclusiones de Derecho, reiteró su criterio.

Inconforme, Andino Torres apeló al Tribunal de Circuito de Apelaciones. Dicho foro (Hons. Rivera de Martínez, Rivera Pérez y Soler Aquino), acogió el recurso como certiorari y emitió resolución confirmando a instancia. Sostuvo ese foro que la Ley del Registro Demográfico no proveía mecanismo alguno para realizar cambios de sexo en un certificado de nacimiento, dado su carácter histórico, en ausencia de circunstancias indicativas de error.

II

A solicitud de Andino Torres, acordamos revisar vía certiorari. Evaluados los planteamientos y argumentos de Andino Torres y del Procurador General de P.R., con vista al criterio mayoritario convergente —aunque por fundamentos distintos y pluralistas— **se revoca la sentencia del Tribunal de Circuito de Apelaciones que confirmó la negativa al cambio de anotación de sexo en el Registro Demográfico y se ordena la enmienda solicitada, atendiendo el procedimiento indicado en la Ley del Registro Demográfico, Núm. 24 del 22 de abril de 1931, según enmendada.**

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió Opinión Concurrente a la que se unen los Jueces Asociados señores Hernández Denton y Fuster Berlingeri; la Juez Asociada señora Naveira de Rodón concurre con el resultado de la sentencia por entender que ésta se limita a interpretar el concepto "sexo" dentro del contexto específico de este caso, en cuanto a realizar un cambio en la constancia que aparece en el Certificado de Nacimiento que se expide por el Registro Demográfico. Ésta es un área que tiene que irse desarrollando caso a caso y la sentencia que hoy se certifica, no debe entenderse como que se proyecta más allá del cambio que autoriza; el Juez Asociado señor Rebollo López emitió

Opinión Disidente a la que se une el Juez Presidente señor Andréu García y, el Juez Asociado señor Corrada del Río emitió Opinión Disidente.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Alexandra M. Andino Torres

   Ex-parte                           CC-97-639     Certiorari


Opinión Concurrente del Juez Asociado señor Negrón García a la cual se unen los Jueces Asociados señores Hernández Denton y Fuster Berlingeri


San Juan, Puerto Rico, a 30 de junio de 2000

"Valiéndose de la **equidad**, los Tribunales han encontrado soluciones a problemas no previstos por el legislador y, es más, absolutamente imprevisibles".[1]

En justicia, es imperativo permitir enmienda a la anotación del sexo en el certificado de nacimiento de un transexual.[2]

---

[1] C. M. Entrena Klett, La equidad y el arte de juzgar, pág. 56 (1979). (Énfasis suplido).

[2] La transexualidad es una condición psicológica en la cual una persona siente que su sexo biológico no corresponde a su percepción de sí mismo. Las personas que padecen de esta condición buscan alterar su sexo para conformarlo con su identificación psicológica, a veces mediante tratamiento hormonal u intervención quirúrgica. Puede distinguirse entonces al transexual pre-

Como prólogo, una aclaración: no tratamos aquí del reconocimiento de un derecho constitucional a cambiar el sexo. Como realidad científica y jurídica, el derecho a someterse a una intervención quirúrgica para alterar los órganos sexuales a los propios del sexo contrario está reconocido.[3] No se discute que este procedimiento médico es claramente más drástico que la simple enmienda documental a una anotación en un certificado de nacimiento. **Este caso más bien plantea la facultad remedial de los tribunales de ordenar una enmienda al Registro Demográfico para concordar la realidad registral con la humana extraregistral.** Hay derechos envueltos, por supuesto, pero en el centro de la controversia jurídica se encuentra, semi oculta, una sutileza burocrática. Es equívoco postular que, de la solicitud de una enmienda al Registro, quiera construirse un nuevo derecho sustantivo. Más bien, las implicaciones de esa enmienda al Registro inciden en derechos fundamentales ya reconocidos. Abordemos separadamente el aspecto registral y las dimensiones de justicia y derecho constitucional.

Si bien es cierto que el Certificado de Nacimiento es un documento histórico , la constancia de los datos vitales contemporáneos al nacimiento es una de la funciones del certificado de nacimiento, pero ciertamente no es la única.

**Precisamente, el carácter histórico del certificado es lo que compele la adopción de mecanismos de enmienda que, sin dejar de reflejar la condición del recién nacido, reflejen también los datos vitales de su historia. ¡Menuda historia sería la que cesara al nacer!**

---

operativo, que no se ha procurado un cambio morfológico-genital, del post-operativo, que ha alterado su apariencia física por esta vía. Para efectos de esta opinión disidente, entenderemos transexual como el post-operativo. Douglas K. Smith, Comment: Transsexualism, Sex Reasignment Surgery, and the Law, 56 Cornell L. Rev. 963, 986 (1971).

[3] Originalmente, se prohibía, tanto en la legislación anglosajona (delito de mayhem) como en la española (delito de lesiones), la mutilación voluntaria realizada con el propósito de evadir el servicio militar. Este delito no existe en Puerto Rico. Thomas B. Stoddard, et al., The Rights of Gay People, pág. 122-23 (1985); Dora Nevárez, Código Penal de Puerto Rico, pág.152-54. (1997).

En la legislación registral asoman en ejemplos de cambios admitidos al certificado de nacimiento para hacer constar ciertos eventos post-natales acaecidos durante la historia de una persona. El más común, el cambio de nombre, sea por adopción, o por voluntad de la persona.

La Ley del Registro Demográfico, Ley Núm. 24 de 22 de abril de 1931, provee en su Art. 31 un detallado procedimiento para las correcciones, alteraciones o enmiendas a los certificados allí custodiados.

> "Disponiéndose, que las omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrado en el Departamento de Salud podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado, **pero luego de haber sido archivado en el Departamento de Salud, no podrá hacerse en los mismos rectificación, adición ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden del Tribunal de Distrito,**[4] cuya orden, en tal caso, será archivada en el Departamento de Salud haciendo referencia al certificado a que corresponda; [...]
>
> Para obtener dicha orden deberá presentar el interesado una solicitud a la Sala del Tribunal de Distrito de su domicilio, exponiendo bajo juramento su pretensión y formulándola debidamente acompañada de la prueba documental pertinente en apoyo de su solicitud. Copia de la solicitud y de toda la prueba documental le será remitida al Ministerio Fiscal simultáneamente con su radicación quien deberá formular su posición dentro del término de 10 días." (Énfasis suplido).

Transcurridos diez (10) días desde la remisión y notificación al Ministerio Fiscal sin que éste haya formulado objeción alguna, el tribunal entenderá y resolverá los méritos de la petición sin necesidad de celebrar vista, o discrecionalmente podrá celebrar vista de estimarlo procedente y dictará el auto que proceda.

> "[...] La rectificación, adición o enmienda de un certificado ya archivado en el Registro General Demográfico se hará insertando en él las correcciones, adiciones o enmiendas autorizadas por el tribunal. Las tachaduras que fueren necesarias se harán de modo que siempre se pueda leer la palabra tachada."

Este texto revela **explícitamente** la permisibilidad de hacer, no sólo correcciones, sino <u>enmiendas</u> a los certificados bajo la custodia del Registro Demográfico, con una **única distinción temporal**: el cambio

---

[4] Ahora Tribunal de Primera Instancia.

después de archivarse el certificado en el Departamento de Salud, requiere orden judicial.

El procedimiento para obtener dicha orden y efectuar el cambio en el Registro hace insostenible la negativa a permitir alteraciones en el certificado. Si no pudieren hacerse tales cambios, ¿a qué entonces la reiterada mención de "enmiendas" al Registro, vocablo que rebasa el sentido de "corrección"? ¿Qué del requerimiento de que la orden judicial autorizando el cambio se archive en el Departamento de Salud y haga referencia al certificado alterado? ¿A qué responde la instrucción de que toda tachadura hecha al certificado original permita siempre la lectura de la palabra tachada?

La única explicación apunta a que el ordenamiento registral demográfico prevé la posibilidad de cambios, no sólo correctivos, sino enmendatorios, que reflejen cambios en el historial personal. Sólo cabe proteger con tanto celo la constancia de los datos originalmente inscritos si su alteración representa un cambio real y sustancial.

En resumen, el examen que antecede de la letra de la ley, nos lleva a concluir que el ordenamiento positivo puertorriqueño no prohibe las enmiendas a los asientos del Registro Demográfico.

II

Aclarado este extremo, analicemos cuáles enmiendas deben reconocerse y hacerse constar en los certificados que el Departamento de Salud expida. La tarea exige revisitar nuestra pasada jurisprudencia.

En Ex Parte Pérez, 65 D.P.R. 938 (1946), resolvimos que en ausencia de una disposición expresa tales cambios no estaban permitidos. Allí, la peticionaria, aunque inscrita con el apellido Pérez, siempre había sido conocida por Torres. Al sostener la negativa al cambio hicimos notar que ni la Ley anterior, Núm. 61 del 9 de marzo de 1911, ni la de 1931 –aún vigente, aunque extensamente enmendada–, lo autorizaba.[5] Concluimos pues,

---

[5] La ley española vigente al darse el cambio de soberanía, aplicada a través del Reglamento para la Ejecución de la Ley del Registro Civil en las islas de Cuba y Puerto Rico, 6 de noviembre de 1884, permitía explícitamente el cambio de nombre en sus Arts. 4 y 90 al 95.

que la omisión de una disposición análoga en la ley de 1931 excluía esa posibilidad. En consecuencia, las alteraciones en el certificado eran numerus clausus.

Tan drástica conclusión era innecesaria. Si bien la Ley de 1931 no disponía expresamente para el cambio de nombre, **tampoco lo prohibía**. En efecto, la disposición original relativa a los cambios, correcciones y enmiendas al Registro Demográfico, que sobrevive como parte del actual Art. 31, permitía las alteraciones a los certificados del Registro de forma general, distinguiendo, como hemos dicho, sólo el momento en que se hace la modificación. A todas luces, el Legislador de 1931 no había excluido terminantemente los cambios de nombre de la normativa registral; más bien, los permitió de manera general. Del mismo modo, el Legislador de 1950, al enmendar la ley para autorizar el cambio de nombre, no hizo más que proveer un nuevo procedimiento para lo que había sido una vieja práctica.[6]

En cualquier caso, y aun admitiendo, arguendo, la corrección de Ex Parte Pérez, sus hechos son distinguibles del caso de autos. Nos explicamos.

III

---

[6] Al presentarse el proyecto de ley para permitir lo que en Ex Parte Pérez habíamos prohibido (P. de la C. 361, 1950), el legislador promovente explicó la situación provocada por nuestra opinión y el correspondiente remedio legislativo:

"Sr. Alvarado: En Puerto Rico antes de que se resolviese por el Tribunal Supremo el caso de Ex Parte Pérez se tramitaban en las Cortes de Distrito unos expedientes de In Perpetuam Memoriam para corregir errores de nombre en las personas y hacer que se facilitara **la expresión de la realidad** en el Registro Demográfico. El caso del Supremo produjo cierta confusión y hace que sea difícil actualmente el trámite de los procedimientos. Esos procedimientos se llevaban a cabo partiendo de disposiciones de la Ley de Enjuiciamiento Civil Española y, aplicando esa Ley en forma técnica, es que el Supremo ha resuelto que hay ciertas cosas que no se pueden tramitar como se venían tramitando. Es conveniente y necesario que haya un procedimiento oficialmente conocido, del cual se pueda depender para hacer estas correcciones. Este proyecto tiende a corregir esa situación estableciendo el procedimiento. Si se aprueba, entonces sabremos qué es lo que hay que hacer para corregir en el Registro Demográfico **una dificultad** o un error en el nombre en la persona." Actas de la Cámara de Representantes (1950), pág. 643 (Énfasis suplido).

Al momento de aprobarse la Ley del Registro Demográfico era bien conocida, aunque excepcional, la práctica de cambio de nombre. Existía al menos un claro precedente legislativo en la legislación insular española, que permitía dicha alteración al Registro. No había, sin embargo, un precedente sustancial de procedimientos quirúrgicos para cambiar el sexo de una persona. **La Asamblea Legislativa, al aprobar la Ley de 1931, no tenía razón para contemplar, con asenso o divergencia, la posibilidad de una solicitud de cambio de sexo en el certificado de nacimiento.**[7] Con el pasar del tiempo y el avance de la ciencia se hizo más probable esta situación. La corriente de la historia —algunas veces lenta, otras rápidamente— ha inundado el ordenamiento y, a su paso, dejado múltiples lagunas en la ley. **Para cruzarlas, no podemos más que abordar la nave de la equidad; pocos casos tanto como el presente ameritan recurrir a esta fuente excepcional y supletoria del derecho.**

> "[H]ay casos en los que el juez se enfrenta con hechos nuevos, originales, con motivaciones sui géneris o con finalidades anormales, respecto a los cuales o no encuentra regla promulgada en el abanico legal o la norma está dictada en contemplación de supuestos anacrónicos, diferentes o, incluso, divergentes o las consecuencias que irroga la aplicación estricta de la ley repugnan al sentir social del momento. **Y el juez tiene que hacer justicia; justicia de hoy; justicia de la época en la que aplica la norma.** Sabemos del terrible desconcierto de nuestros navegantes de principios del siglo XVI cuando, al descender del Ecuador, se encontraban faltos de la Estrella Polar, carecían aún de brújula y las constelaciones del hemisferio Sur les eran desconocidas todavía; tenían que navegar hacia Occidente, era su compromiso con la Corona, y lo continuaban haciendo —cumpliendo su obligación— valiéndose exclusivamente de su sentido intuitivo de la orientación. Así tiene que obrar el juez cuando se encuentra falto de norma directamente aplicable, ante la norma anacrónica, interpretando el precepto lacónico, frente a la ley cuya observación estricta deviene en injusticia. Es el momento en el que tiene que echar mano de su sentido de justicia, tiene que ampararse en la equidad."[8]

---

[7] La primera operación exitosa de cambio de sexo se llevó a cabo en Alemania en 1931. Douglas K. Smith, supra, 986. Sin embargo, no fue hasta 1966 que se estableció una clínica —la Gender Identity Clinic en Johns Hopkins Hospital— que realizara dichos procedimientos quirúrgicos en Estados Unidos. John P. Holloway, Transsexuals – Their Legal Sex, 40 U. of Colorado L. Rev. 282, 284-85 (1968).

[8] Entrena Klett, op.cit., pág. 13. (Énfasis suplido).

Pero, en esa búsqueda, ¿en que dirección hemos de navegar? Sin un rumbo fijo que permita hacer una distinción valorativa, nuestro barco podría abordar a los puertos jurisprudenciales de Australia, Japón, Francia, Bélgica, Inglaterra, España y encalla en varios estados norteamericanos. Admitidamente, esa trayectoria sería un ejercicio de derecho comparado, de descartarse aplicar aquí los principios de equidad. Ello nos obliga a revisar las cartas marítimas de nuestras fuentes de equidad.

En esta gestión, de inmediato advertimos que no podemos ser muy liberales en la selección de foros consultivos.[9] Aun en la aplicación de la equidad, hay normas de hermenéutica que obedecen exclusivamente a nuestra tradición civilista. "[C]uando no hay ley aplicable al caso, el tribunal resolverá conforme a equidad, según la define el Art.7 del Código Civil, 31 L.P.R.A. sec.7. **No se refiere, desde luego, el Código a la 'Equity' anglosajona, sino a la equidad civilista.**" Dalmau v. Hernández Saldaña, 103 D.P.R. 487, 489 (1975) (Énfasis suplido). Ver también Silva v. Comisión Industrial, 91 D.P.R. 891, 898-900, 903-04 (1965).[10]

IV

En España, fuente de nuestra primera legislación registral civil, se ha planteado en reiteradas sentencias judiciales, primero, que la enmienda de la anotación de sexo en el Registro Civil producto de una modificación quirúrgica **no está contemplada** en la Ley de Registro Civil,

---

[9] Recordamos lo resuelto en Valle v. Amer. Inter. Ins. Co., 108 D.P.R. 692, 696-97 (1979):

> "Se revocan en consecuencia los casos citados en todo lo que entrañe la utilización de preceptos del derecho común para resolver problemas de derecho civil. En los casos apropiados será lícito el empleo del derecho común en sus múltiples y ricas versiones——la angloamericana, la original británica, la anglocanadiense y otras——a modo de derecho comparado, así como el uso de ejemplos de otros sistemas jurídicos."

[10] Cabe notar que incluso la jurisdicción federal ha admitido este principio. "Al interpretar el Código Civil de Puerto Rico, sin embargo, los comentarios duchos sobre disposiciones análogas del Código Civil Español son más persuasivos que las analogías con el common law, las que son inaplicables salvo para el propósito de un análisis comparado."

segundo, que esta omisión constituye una laguna en la ley que los tribunales deben superar **aplicando la equidad** y, tercero, que de la aplicación de la equidad **resulta permisible el cambio de la anotación de sexo** en el Registro Civil.

Este enfoque se nutre de la realidad jurídica de que la actual Ley del Registro Civil española, aprobada el 8 de junio de 1957,[11] no dispone expresamente para la enmienda de asientos en las inscripciones registrales. Establece un procedimiento general para rectificar inscripciones "por sentencia firme recaída en juicio ordinario" en pleito instado contra el Ministerio Fiscal. Art. 92, Ley Registro Civil. Ciertos cambios, sin embargo, pueden hacerse mediante expediente gubernativo. En cuanto a la modificación del renglón de sexo, la ley sólo indica que "pueden rectificarse previo expediente gubernativo: [...] 2.º La indicación equivocada del sexo cuando igualmente no haya duda sobre la identidad del nacido por las demás circunstancias". Art. 93, Ley Registro Civil. Igualmente, la Regla 294 del Reglamento del Registro Civil, aprobado el 14 de noviembre de 1958, contempla únicamente la rectificación de la inscripción de sexo y se limita a enumerar los extremos a investigarse cuando se solicite dicho cambio.

Así, el Tribunal Supremo español ha sostenido que "[e]n nuestra patria [viz. España], en cambio, no hay Ley civil que aborde el problema de la transexualidad" Sentencia del 2 de julio de 1987, "[y] es que si, **ante la inexistencia de una norma de rango legal que regule tal materia, bien sea para permitirlo o prohibirlo, se produce una laguna de Ley, que no releva al órgano jurisdiccional**

---

Republic Sec. Corp. v. Puerto Rico Aqueduct, etc., 674 F.2d 952, 958 (1982) (traducción nuestra).

[11] Esta ley sustituyó la antigua ley provisional del Registro Civil, que regía en Puerto Rico al momento del cambio de soberanía.

**de su deber de resolver la cuestión ante él sometida"**. Sentencia del 3 de marzo de 1989. (Énfasis suplido). Ese alto foro ha empleado la metodología —tan sabia en principio como correcta en derecho— de acudir al orden de fuentes que establece Art. 1 del Código Civil español, referente a los "principios generales del derecho",[12] para forjar una solución justa y racional al problema de la transexualidad. Para esclarecer esos principios a la luz de su derecho positivo, ha buscado orientación en la normativa constitucional. Reproducimos su ilustrado criterio:

> **"Hay que tener en cuenta que las leyes positivas pueden subsistir intactas en el tiempo; pero hay que convenir también en que, bajo la presión de los hechos y de las necesidades prácticas, se presentan, las más de las veces, situaciones nuevas imprevistas por el legislador que demandan una solución. Tal ocurre con la transexualidad: un problema de nuestros días, una realidad evidente que demanda una solución jurídica.**
>
> **En una primera aproximación al problema justo es convenir que la solución que se adopte ha de ser netamente jurídica, pues la puramente biológica no puede aceptarse en tanto en cuanto a ésta no puede haber cambio de sexo, ya que continúan inmutables los cromosomas masculinos.**
>
> **En este orden de ideas cabría preguntarse si el recurrente ha cambiado de sexo. Atendiendo a las llamadas máximas de experiencia y a lo que entiende el común sentir de nuestras próximas áreas culturales, es evidente que sí ha habido un cambio. [...]**
>
> La transexualidad, en el caso que ahora se enjuicia, supone una operación quirúrgica que ha dado como resultado una morfología sexual artificial de órganos externos e internos practicables similares a los femeninos, unidos a una serie de caracteres de que ya se hizo mérito anteriormente.
>
> **Será una ficción de hembra si se quiere; pero el Derecho también tiene su protección a las ficciones. [...]**
>
> **Esta ficción ha de aceptarse para la transexualidad; porque el varón operado transexualmente no pasa a ser hembra, sino que se le ha de tener por tal por haber dejado de ser varón por extirpación y supresión de los caracteres primarios y secundarios y presentar unos órganos sexuales similares a los femeninos y caracteriologías psíquica y emocional propias de este sexo."** Sentencia del 2 de julio de 1987 (Énfasis en original).

---

[12] Aunque enmendado recientemente, el Art. 1 del código español mantuvo, en lo que nos concierne, el carácter supletorio de los "principios generales del derecho" del antiguo Art. 6, equivalente al

Dictámenes posteriores del Tribunal Supremo español y de tribunales de menor jerarquía en esa jurisdicción han seguido la misma ruta decisoria, hasta el punto de considerarla como jurisprudencia reiterada, entendida como fuente supletoria de Derecho.[13]

Al igual que el hermano foro español, consideramos imperativo autorizar el cambio en las constancias del Registro Demográfico para reflejar la realidad física y —lo que es más importante— **social y vivencial** de un cambio en la morfología genital de una persona.

V

Al aplicar la equidad, también recurrimos a la Ley

---

nuestro, en la solución de controversias en las que no haya ley aplicable.

[13] Sentencias Tribunal Supremo del 3 de marzo de 1989 y del 19 de abril de 1991; más recientemente, Sentencia del 21 de septiembre de 1999, Juzgado de 1ª Instancia e Instrucción, Lleida (La Ley, 9 de noviembre de 1999, núm. 11728).

mayor, nuestra Constitución, para guiarnos en la delineación y esclarecimiento de los principios de derecho aplicables a este caso. Nuestra convicción de que es imperativo aceptar la enmienda al certificado de nacimiento solicitada tiene su génesis en la dignidad del ser humano y reivindicación de su respeto propio, su reclamo a la honra y reputación y el derecho a la intimidad. Veamos.

La Carta de Derechos dispone inicialmente, como primer y fundamental axioma, que "[l]a dignidad del ser humano es inviolable." Const. E.L.A., Art. II, sec. 1. Merecen eco aquí las preclaras palabras del Doctor Jaime Benítez ante la Convención Constituyente.

> "Quiero ahora, brevemente, señalar la arquitectura ideológica dentro de la cual se monta esta proposición. Tal vez toda ella está resumida en la primera oración de su primer postulado: la dignidad del ser humano es inviolable. [...] Por eso en nuestra primera disposición además de sentar inicialmente esta base de la igualdad profunda del ser humano—igualdad que trasciende cualquier diferencia, bien sea diferencia biológica, bien sea diferencia ideológica, religiosa, política o cultural—por encima de tales diferencias está el ser humano en su profunda dignidad trascendente." 2 Diario de Sesiones de la Convención Constituyente, pág. 1103 (1952).

La dignidad abarca los más íntimos resguardos de la personalidad. Es requisito sine qua non del respeto propio, el bien más preciado de la persona moral.[14] Si, por razones que a veces escapan al entendimiento convencional, un ser

---

[14] Ver, e.g. John Rawls, A Theory of Justice, pág.440 et seq. (1971).

humano busca integrar su psiquis —mediante un proceso químico y quirúrgico difícil, doloroso, traumático, **pero absolutamente legal**—[15], a un aspecto físico que considera repugnante, es una falta de comprensión de su condición, respeto a su decisión y caridad para con su sufrimiento, negarle reconocimiento a la realidad física y social resultante. **Porque un cambio morfológico en el aparato genético no se da en el secreto de la mente, sino en la publicidad social cotidiana.**

¿Qué de la proyección social de una persona que, no sólo en su físico, sino en todas sus relaciones humanas encarna un sexo determinado, pero en su relación con el estado de derecho ostenta otro? "[A]un reconociendo que los sentimientos de las personas en materia sexual han ampliado el campo de tolerancia y reducido lo que se venía denominando "escándalo", es innegable que, a todas luces y se mire como se mire, aun con un criterio amplio, no es admisible que alguien tenga un sexo y se le haya de considerar como portador de otro distinto en el Registro Civil" Sentencia del 21 de septiembre de 1999, Juzgado de 1ª Instancia e Instrucción, Lleida, <u>supra</u>. **Negarle reconocimiento a esta persona equivale a una pena de incertidumbre indefinida, de destierro perpetuo del campo de la normalidad al que, por la razón que fuese, pensó acceder con ayuda de la ciencia. No somos quien para condenar a un transexual a ese eterno purgatorio.**

La "protección de ley contra ataques abusivos a [la] honra, a [la] reputación y a [la] vida privada o familiar" también figura prominentemente en nuestra Carta de Derechos. Art. II, sec. 8. Esta salvaguarda, sin correspondencia directa en la Constitución federal, comprende dos garantías relacionadas, pero distintas: la protección de la honra y la reputación y el derecho a la intimidad. Ambas serían laceradas

---

[15] Es ilustrativa la Sentencia del 21 de septiembre de 1999, Juzgado de 1ª Instancia e Instrucción, Lleida, <u>supra</u>, a los efectos de explicar que "no se trata de sexualidad equívoca o dudosa y caprichosa adoptado con finalidad perturbadora de una sana vida de relación, sino de una decidida voluntad de hacer dejación definitiva de unos atributos sexuales que repudia el íntimo sentir de una persona transida por un íntimo deseo de pertenecer a un sexo distinto al que ostentaba al nacer, con aversión a la representación física de aquél".

de no reconocerse en el certificado de nacimiento el cambio de morfología sexual. Una persona que se somete a una operación **irreversible** para adecuar su sexo físico a su deseo psicológico no desea vivir como un transexual, como una clasificación extraña y discordante con la dualidad de sexos culturalmente reconocida. Desea presentarse ante el mundo como una persona del sexo que ha escogido. Demás está decir que la constancia en el certificado de nacimiento del sexo original derrota ese proyecto. No existe interés del estado que justifique negar ese deseo.[16] La alegación de fraude en este renglón tampoco es acertada. **El transexual no tienen intención de defraudar a la sociedad sino, por el contrario, de corregir una disyuntiva de su personalidad que considera, por sí misma, fraudulenta.**

Ciertamente, también el derecho a la intimidad tiene mucho que aportar a la solución de este problema. En incontables ocasiones hemos declarado la factura más ancha de esta importante garantía ciudadana. Hemos mencionado su relevancia a las relaciones familiares, Figueroa Ferrer v. E.L.A., 107 D.P.R. 250, 263 (1978), y laborales, Arroyo v. Rattan Specialties, Inc., 117 D.P.R. 35 (1986). Declaramos además, que tiene aplicación ex proprio vigore y opera entre personas privadas.

Más aun, ha sido un criterio que ha trascendido diversas posiciones de miembros de este Tribunal el que ciertas preguntas le están vedadas por la protección que la
Constitución garantiza y, por tanto, cierta información, por su naturaleza, es íntima y privada. En Arroyo v. Rattan Specialties, Inc.

---

[16] No puede negarse que la admisión de enmiendas al encasillado de sexo en el certificado de nacimiento podría tener efectos en otras áreas de nuestro ordenamiento, particularmente en lo referente al matrimonio, actualmente prohibido a los transexuales. Art. 68, Código Civil. Sin embargo, no es éste el lugar ni el momento en el que decidir el alcance de esas consecuencias. Basta notar    —ateniéndonos al procedimiento preceptuado en la Ley del Registro Demográfico para todo cambio, corrección o enmienda a un certificado— que no deja de constar, en el mismo registro, copia del certificado originalmente expedido y de la sentencia judicial autorizando su modificación. Permitir la modificación de la anotación de sexo en un certificado de nacimiento de ningún modo resuelve la ulterior controversia sobre la capacidad para contraer matrimonio. También aquí se prevendría cualquier alegado fraude.

tanto la mayoría como las opiniones concurrentes[17] coincidieron en que la sexualidad es una de esas áreas.

> "Durante la prueba del polígrafo al obrero se le pueden hacer preguntas no relacionadas con el asunto que está bajo investigación o con los intereses legítimos del patrono, preguntas impropias que invaden su intimidad. El técnico, durante la entrevista preliminar y al dar la prueba, puede preguntar, por ejemplo, sobre aquellos asuntos que al patrono le interese saber la reacción o parecer del obrero y sobre los cuales el obrero normalmente no vendría obligado a informar; asuntos tales como [...] sus preferencias sexuales, [...] o conducta de alguna naturaleza que a la persona no le interese divulgar." Arroyo v. Rattan Specialties, Inc., supra, pág. 48-49.

En este aspecto, sabemos que casi toda solicitud de empleo requiere la presentación de un certificado de nacimiento. **Para una persona cuya apariencia y comportamiento configuran un sexo determinado, la**

---

[17] C.f. "Son las preguntas las que son susceptibles de invadir esferas personales protegidas constitucionalmente". Arroyo v. Rattan Specialties, Inc., supra, pág. 69 (Opinión concurrente y disidente del Juez Asociado señor Negrón García); "No entiendo en qué viola el derecho a la intimidad una prueba del detector de mentiras, cuando sólo se pregunte aquello que normalmente se pregunta en cualquier entrevista de empleo. Ese ha sido el análisis seguido por la escasa jurisprudencia federal que se ha enfrentado a este problema. En Thorne v. City of El Segundo, 726 F.2d 459 (9no Cir. 1983), citado en el escolio 7 de la opinión mayoritaria, no se resuelve que el uso del detector de mentiras en el área gubernamental viola la ley de derechos civiles federales, 42 U.S.C. sec. 1983. Allí lo que se resolvió fue que el haberle preguntado a la peticionaria sobre su conducta sexual y el basar la decisión de no emplearla en las respuestas a esas preguntas violó sus derechos civiles. Id., pág. 471. El resultado sería el mismo aun si el interrogatorio no se hubiese realizado mediante un detector de mentiras." Idem., pág. 77-78 (Opinión concurrente y disidente del Juez Asociado señor Hernández Denton).

**presentación de dicho certificado invitaría cuestionamientos impertinentes a su capacidad para desempeñarse en su trabajo, violativos de la más íntima esfera de su ser y, en sus efectos, nocivos a su proyección social escogida.** Un mero expediente de <u>Ad perpetuam rei memoriam</u>, no basta para subsanar esa intromisión. No altera la certificación oficial del sexo y, por tanto, obliga al transexual a divulgar información que, de otro modo, no le sería requerida. Los efectos, dados los prejuicios sociales en los que no es necesario abundar, serían catastróficos para la persona afectada.

VI

**No existe impedimento en derecho y sí, un mandato de equidad, a autorizar la enmienda solicitada al certificado de nacimiento.** Suscribimos, pues, la Sentencia que revoca al Tribunal de Circuito de Apelaciones y nuestro mandato ordenando la enmienda al renglón de sexo del certificado de nacimiento, atendiendo el procedimiento indicado en la Ley del Registro Demográfico.


ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

Alexandra M. Andino Torres

    Ex-parte

                          CC-1997-639         CERTIORARI


**OPINIÓN DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ, A LA CUAL SE UNE EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA**

San Juan, Puerto Rico, a 30 de junio de 2000.


Mediante la Sentencia mayoritaria que hoy emite el Tribunal en el presente caso, y la Opinión concurrente que sirve de sostén a la misma, el Tribunal <u>jurisprudencialmente</u> abre el camino y sienta las bases para que en nuestra jurisdicción dos personas del mismo sexo, uno de ellos transexual, se puedan casar entre sí.

Esa es la <u>consecuencia jurídica inescapable</u> de la decisión que hoy se emite; ello en vista del hecho de que, <u>a base de una mera aseveración de que se siente mujer y de una intervención quirúrgica que no cambió el sexo de la persona como tal</u>, el Tribunal convierte a Andrés Andino Torres en una mujer para todos los efectos

jurídicos, pudiendo esta persona contraer matrimonio, como una mujer, ya que su certificado de matrimonio así lo establece de manera oficial.


I

Al momento de su nacimiento, el 29 de abril de 1950, la parte recurrente exhibía un fenotipo masculino que justificó su inscripción en el Registro Demográfico como varón con el nombre de Andrés Andino Torres. En el año 1976 Andrés se sometió, voluntariamente, a un procedimiento quirúrgico que tuvo el efecto de transformar físicamente su sexo para que correspondiera al fenotipo femenino. Desde ese momento la parte recurrente conduce su vida como mujer, se proyecta ante otros como tal y utiliza el nombre femenino con el que recurre ante nosotros, Alexandra Andino Torres.[18] En aras de armonizar los hechos de su vida con la realidad jurídica, la parte recurrente solicitó del Tribunal de Primera Instancia, Subsección de Manatí, que, luego de los trámites pertinentes y necesarios dictase sentencia ordenándole al Registro Demográfico de Manatí cambiar el nombre masculino que constaba en su certificado de nacimiento por el de Alexandra Andino Torres y cambiar la anotación que de su sexo masculino se había hecho por una relativa al sexo femenino.

Luego de aquilatar la prueba, el tribunal de instancia dictó una resolución mediante la cual declaró con lugar la petición <u>únicamente</u> en lo relativo a la solicitud de cambio de nombre; esto es, el foro de instancia <u>denegó</u> la petición de enmienda a la inscripción del apartado relativo al sexo. Como fundamento de su decisión, expresó el mencionado tribunal que "no existe legislación en este momento que permita el cambio de sexo en el Registro Demográfico. Hacemos constar que la ley permite correcciones de sexo, pero no cambio de sexo."

---

[18] En su tarjeta de seguro social expedida por el Gobierno de los Estados Unidos de América, así como en su tarjeta electoral, figura como Alexandra M. Andino Torres.

Inconforme, la parte recurrente acudió ante el Tribunal de Circuito de Apelaciones exponiendo que "[e]rró el Tribunal de Instancia al declarar No Ha Lugar al cambio de sexo fundamentando su decisión en que no existía legislación en ese momento que le permitiese el cambio de sexo en el Registro Demográfico." Argumentó la recurrente que el Artículo 7 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 7, dispone de la materia a su favor al exigirle al juez la resolución de todo caso planteado ante él aun recurriendo a la equidad, es decir, lo justo de acuerdo con los principios generales del derecho en casos en que la ley no disponga de la controversia.[19]

Argumentó, además, la parte recurrente ante el Tribunal de Circuito que "[l]o más justo en este caso, es que una persona que es una mujer para todos los fines, no tenga que cada vez que va a hacer una gestión de viaje o de cualquier otra naturaleza que tenga que mostrar su certificado de nacimiento o pasaporte, tenga que expresar con lujo de detalles todos los eventos que han pasado por su vida después de la operación y señalar que un Tribunal no le ha permitido el cambio en su certificado."

El Tribunal de Circuito de Apelaciones <u>confirmó</u> la resolución del tribunal de instancia. Es de esa resolución que acudió la parte recurrente ante este Tribunal. En el recurso de certiorari, que a esos efectos radicara, le imputa al foro apelativo intermedio haber errado:

> "–... al declarar NO HA LUGAR al cambio de sexo fundamentando su decisión en que no existía legislación al momento que le permitiese el cambio de sexo en el Registro Demográfico.
> –... al concluir que el certificado de nacimiento es un documento cuyo propósito es exponer las circunstancias al momento del nacimiento y que no puede permitirse para [sic] hacer constar un hecho ocurrido posterior a éste.
> –... al señalar que el Artículo 31 de la Ley 24 del 22 de abril de 1931, 24 L.P.R.A. sec. 1231, no provee mecanismo para realizar cambios de sexos en un certificado de nacimiento.

---

[19] Dispone el Art. 7 del Código Civil, *ante*, que:

> "El tribunal que rehuse fallar a pretexto de silencio, obscuridad o insuficiencia de la ley, o por cualquier otro motivo, incurrirá en responsabilidad.
> Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

–... al concluir que para poder adjudicar la controversia sería necesario obviar la ley vigente."

**Hoy una mayoría del Tribunal Supremo de Puerto Rico <u>revoca</u> la correcta decisión que emitiera el Tribunal de Circuito de Apelaciones. <u>Disentimos; veamos por qué</u>.**

II

**El Artículo 31 de la Ley Número 24 de 22 de abril de 1931, en lo pertinente al caso de autos, <u>originalmente</u> disponía que:**

> "El Comisionado de Sanidad preparará, hará imprimir y facilitará a los Encargados de Registro todos los libros, impresos y formas que han de usarse para inscribir los nacimientos, casamientos y defunciones que ocurran o se celebren en la Isla de Puerto Rico, o que fueren necesarios para llevar a cabo los propósitos de esta ley [...].

Disponiéndose, que las omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrado en el Departamento de Sanidad podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado, pero luego de haber sido archivado en el Departamento de Sanidad, no podrá hacerse en los mismos rectificación, adición, ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden de una Corte de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Sanidad haciendo referencia al certificado a que corresponda."

Al amparo de este estatuto, resolvimos el caso de <u>Ex Parte Pérez</u>, 65 D.P.R. 938 (<u>1946</u>). En el referido caso, la peticionaria solicitó que, previo los trámites de ley, se aprobara un expediente *ad perpetuam memoriam* y se ordenara cambiar, en la inscripción de su nacimiento, su apellido de Pérez a Torres ya que, según quedó evidenciado en la vista celebrada ante el tribunal de instancia, por la prueba que ella a esos efectos presentara, toda su vida había sido conocida por el apellido Torres. Al denegar su reclamo, expresamos entonces que el antes

transcrito estatuto <u>no</u> constituía autoridad para un cambio de nombre o de apellido en el Registro Demográfico y que el así autorizarlo jurisprudencialmente sería actuar contrario a lo establecido por nuestro ordenamiento jurídico. En vista de ello, y aun estando conscientes de la razonabilidad del reclamo de la allí peticionaria, resolvimos que, dentro de los estrechos límites de la información *ad perpetuam*, <u>no</u> procedía una orden disponiendo el cambio de un nombre o apellido. Expresamos en dicho caso, por último, que era a la Asamblea Legislativa a la cual le correspondería actuar para corregir "...lo que entendemos es un defecto en nuestra legislación."[20]

La Rama Legislativa procedió a enmendar el antes citado Artículo 31 el 26 de abril de 1950 para, entre otros asuntos, autorizar los cambios de nombre y apellidos y establecer el procedimiento a seguirse para tales propósitos. Dicho estatuto dispone, en lo pertinente al caso de autos, que:

"§1231. Supervisión a cargo del Secretario de

Salud; cambios en registros

El Secretario de Salud preparará, hará imprimir y facilitará a los encargados de registros todos los libros, impresos y formas que han de usarse para inscribir los nacimientos, casamientos y defunciones que ocurran o se celebren en el Estado Libre Asociado de Puerto Rico, o que fueren necesarios para llevar a cabo los propósitos de esta Parte, y preparará y distribuirá aquellas instrucciones detalladas que no estén en conflicto con las disposiciones de esta Parte y que pudieran ser necesarias para la aplicación uniforme de la misma para el mantenimiento de un

---

[20] Debe <u>enfatizarse</u> el hecho de que, aun cuando resolvimos lo arriba expuesto, en el citado caso de <u>Ex Parte Pérez</u> reconocimos la utilidad del expediente *ad perpetuam memoriam* para hacer acreditar hechos en los registros públicos sin perjuicio a terceros, aunque tal recurso no fuera suficiente para autorizar alguna enmienda en las anotaciones del Registro Demográfico no obstante tratarse de un documento en que "consten los actos jurídicos que de algún modo modifiquen e estado civil o la condición de la persona inscrita" en el Registro Demográfico. <u>Ex Parte Pérez</u>, ante, nota al calce "número 9, a la pág. 944.

perfecto sistema de registro; y para tales fines no podrán usarse otros libros, impresos y formas que aquellos que suministre el Secretario de Salud. Dicho Secretario hará que los certificados que se reciban mensualmente en su Departamento procedentes de los encargados de registros sean examinados cuidadosamente y requerirá la información adicional que sea necesaria en aquellos que aparezcan incompletos o defectuosos, para lo cual toda persona que tenga conocimiento de hechos concernientes a cualquier nacimiento, casamiento o defunción, estará obligada a suministrar dicha información, cuando a ello sea requerida por el Secretario de Salud en persona o por medio de su representante acreditado, por correo, o por conducto del Registrador del distrito; Disponiéndose, que las omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrado en el Departamento de Salud podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado, pero luego de haber sido archivado en el Departamento de Salud, no podrá hacerse en los mismos rectificación, adición ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden del Tribunal de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Salud haciendo referencia al certificado a que corresponda; Disponiéndose, sin embargo, que cuando el reconocimiento de un hijo natural se hiciere en documento público o en una declaración jurada bastará la presentación de dicho documento o declaración para que el encargado del Registro Demográfico proceda a inscribir el mismo, y a ese efecto, se llenará el correspondiente certificado de inscripción; Disponiéndose, además, que en caso de que el nacimiento de tal hijo hubiera sido previamente inscrito se llevará al certificado los datos adicionales que resulten de tal reconocimiento.

........................................................
................................

.................................................................

............................

.................................................................

............................

El cambio, adición o modificación de nombre o apellido sólo podrá hacerse a instancia del interesado, quien deberá presentar ante cualquier Sala del Tribunal de Distrito la oportuna solicitud, expresando bajo juramento los motivos de su pretensión, acompañada de la prueba documental pertinente en apoyo de su solicitud. Copia de la solicitud y de toda la prueba documental le será remitida al Ministerio Fiscal simultáneamente con su radicación.

...............................................................

............................"

III

Un estudio detenido de la Ley del Registro Demográfico, en especial de sus Artículos 21 y 31, nos lleva a la conclusión de que el Certificado de Nacimiento es un documento esencialmente histórico sobre una persona con el propósito de dejar constancia de determinada información vital de ésta al momento de nacer. Una vez anotados tales datos correctamente, en atención al momento del nacimiento, no podrán ser enmendados éstos salvo por excepción legislativamente autorizada de forma expresa.[21] Es de notar, sin embargo, que la Ley del Registro Demográfico atiende la preocupación de reflejar las modificaciones del estado civil o condición de la persona según resulte de sus actos jurídicos. Los documentos acreditativos de tales actos podrán constar

---

[21] Tal es el caso de las enmiendas a la Ley para autorizar el cambio de nombre y las anotaciones en atención a las adopciones. Véase 24 L.P.R.A. secs. 1136 y 1231. Además, K. v. Health Division, P. 2d 1070 (Oregón 1977).

en un <u>archivo especial</u> del Departamento de Salud como suplementos

informativos al certificado de nacimiento al cual harán referencia.

Un cambio en el sexo del inscrito[22], <u>no</u> puede provocar una enmienda

en las constancias del Registro Demográfico; ello a tenor con la letra

y el desarrollo de la Ley del Registro Demográfico. Del Artículo 31 de

la Ley del Registro Demográfico, *ante*, surge que el legislador autorizó

al Secretario de Salud o a un funcionario autorizado por él, a corregir

---

[22] Los problemas jurídicos relativos a la condición conocida como transexualidad son materia novel en Puerto Rico. En otras jurisdicciones del mundo, como España, Estados Unidos e Inglaterra se ha atendido, aunque en pocas ocasiones, el asunto que parece ir cobrando vigencia con el avance del tiempo. Una persona que exhibe una condición de transexualidad es aquella que tiene las características físicas y anatómicas de un sexo, se siente psicológicamente como si fuera un miembro del sexo opuesto, y desea vehementemente pertenecer a éste en forma consumada. Véase, Margaret Otlowski, *The Legal Status of a Sexually Reassigned Transsexual: R. v. Harris & Mc. Guiness and Beyond*, 64 Australian Law Journal, 67-74, a la pág. 67 (1988). El transexual se siente obsesionado con el deseo de alterar su cuerpo, su apariencia física general y su status social para conformarlos con el que a nivel emocional y psicológico siente es su verdadero sexo. Este conflicto le causa problemas psicológicos que en algunos casos pueden ser muy severos. *Transsexual Marriages: Are They Valid Under California Law?*, 16 Sw. U.L. Rev. P. 503-531, 511-12, 515. En aras de eliminar conflictos, muchos transexuales recurren a operaciones quirúrgicas para cambio de sexo. Algunas autoridades médicas aseguran que luego de realizada la operación el cambio de sexo es efectivo. Sin embargo, otras autoridades sostienen que una operación para cambiar el sexo a un paciente no lo altera realmente. De acuerdo a esta opinión, el paciente transexual varón permanece siendo hombre. Según dicha teoría el alegado cambio de sexo es una ficción al quedar inalterada la constitución cromosómica de la persona. Tribunales de Inglaterra, Australia, Japón, Francia y Bélgica se han expresado en esos términos. Véanse <u>Corbett</u> v. <u>Corbett</u>, (P.D.A. 1970), 2 W.L.R. 1306, 2 ALL E.R. 33, <u>Anonymous</u> v. <u>Weiner</u>, 50 Misc. 2d 380, 270 N.Y.S. 2d 319 (1966) y en <u>In re Ladrach</u>, 513 N.E. 2d 828 (Ohio 1987) y García Cantero, Gabriel, *Spain; Sex Change and the Courts*, 29 J. Fam. L. P. 425-429 (1990-91). Esto, sin duda, enriquece al número de complicaciones que jurídicamente han de tenerse presentes a la hora de definir, dentro del marco de un litigio referente a transexualidad, lo que jurídicamente es "sexo". En España se ha resuelto que el factor determinante a tomarse en cuenta para señalar el sexo de una persona en un caso muy parecido al que nos ocupa lo es la constitución física de la persona, el fenotipo exhibido. Véase Sentencia de lo Civil de 3 de marzo de 1989. En Inglaterra, sin embargo, se resolvió que el criterio determinante lo sería el cromosómico. <u>Corbett</u> v. <u>Corbett</u>, *ante*. De igual forma algunos tribunales estatales de los Estados Unidos han abordado el tema. En <u>Anonymous</u> v. <u>Weiner</u>, 50 Misc. 2d 380, 270 N.Y.S. 2d. 319, se resolvió que el Código de Salud de la ciudad de Nueva York no proveía una base para cambiar el sexo en el certificado de nacimiento después de efectuada una cirugía para cambiar el sexo de un transexual. En apelación, la Corte Suprema de la ciudad de Nueva York confirmó la determinación de la Junta. Véanse, además, <u>Anonymous</u> v. <u>Anonymous</u>, 67 Misc. 2d 928, 325 N.Y. 2d 499 (1971), <u>B.</u> v. <u>B.</u>, 78 Misc. 2d 112, 355

algún error o a añadir alguna información que inadvertidamente o por error se haya omitido en el certificado de nacimiento, sin necesidad de orden judicial, cuando tales anotaciones no alteren sustancialmente el mismo y dicho certificado no haya sido registrado aún en el Departamento de Salud. En caso de que sea necesario enmendar o añadir datos en el certificado, luego de haber sido el mismo registrado, será necesaria una orden del tribunal. Actos vitales posteriores al nacimiento, repetimos, no serán motivo de enmiendas a las constancias del Registro salvo en los casos de excepción legislativamente autorizados.

No erró el tribunal de instancia al denegar la enmienda de la anotación referente al sexo de la parte recurrente en el Registro Demográfico, basado en que tal sustitución sería contraria a la Ley. Anotamos, sin embargo, que la resolución del Honorable Juez de Instancia no es un modelo de claridad al expresar que "[h]acemos constar que la ley permite correcciones de sexo pero no cambio de sexo". No obstante, el resultado de su análisis es correcto. La Ley del Registro Demográfico dispone de la controversia de forma adversa a la parte recurrente al exponer, a modo de numerus clausus, las únicas instancias en que se podrá obrar cambios en las anotaciones de datos vitales en el certificado de nacimiento, habiendo surgido la realidad de tales nuevos datos con posterioridad al nacimiento e inscripción de la persona. Una enmienda a la anotación del sexo del inscrito como resultado de una operación de "cambio de sexo" es un acto prohibido por la Ley del Registro Demográfico.

A modo de conclusión, observemos que fue meritorio el planteamiento cuando, en 1946, en Ex Parte Pérez, ante, la peticionaria alegó y probó bajo el imperio de la letra original de la Ley del Registro Demográfico de 1931, que era un hecho indisputablemente histórico que al momento de su nacimiento el apellido inscrito de su

---

N.Y.S. 2d 712 (1974), In Re Ladrach, 513 N.E. 2d 828 (Ohio 1987), K. v. Health Division, ante.

padre era Pérez, pero que todos lo llamaban por Torres y como tal se creía y hacía llamar, y que, por lo tanto, su certificado de nacimiento no reflejaba correctamente, como habría sido conveniente, la realidad del hecho vital de su padre consistente en la adopción de un apellido distinto al que constaba en el registro demográfico. Sin embargo, allí expresamos que:

> "Otro obstáculo que encontró la corte es que en Puerto Rico no existe estatuto que autorice el cambio de nombres o apellidos. Es verdad. [...] Ni en la Ley de Registro Civil de 1911, ni en la Ley del Registro Demográfico de 1931 que vino a sustituirle, ni en ninguna otra ley, se autoriza procedimiento alguno para cambiar nombres o apellidos, en el registro civil de ayer o en el registro demográfico de hoy." Ex parte Pérez, 65 D.P.R. 938, 942 (1946).

Entonces sabíamos que en el segundo párrafo del Art. 31 de la Ley del Registro Demográfico no constaba ninguna autorización para que los tribunales ordenasen el cambio de las constancias del Registro en atención a hechos vitales posteriores al momento del nacimiento. Esto, sin obviar que dicho artículo disponía y dispone que:

"las omisiones o incorrecciones que aparezcan en cualquier certificado antes de ser registrado en el Departamento de Sanidad podrán ser salvadas insertando las correcciones o adiciones necesarias en tinta roja en dicho certificado, pero luego de haber sido archivado en el Departamento de Sanidad, no podrá hacerse en los mismos rectificación, adición, ni enmienda alguna que altere sustancialmente el mismo, sino en virtud de orden de una Corte de Distrito, cuya orden, en tal caso, será archivada en el Departamento de Sanidad haciendo referencia al certificado a que corresponda."

Con algún excepticismo cabía y cabe preguntarse: ¿A qué rectificaciones, adiciones o enmiendas se refiere el legislador en ese artículo como válidas si son autorizadas por los tribunales? ¿Acaso una persona que consta inscrita como Pérez porque así fue inscrito su padre, pero que se hace llamar Torres, y que solicita que en el

Registro se tache el apellido Pérez y se anote el de Torres no está suplicando del tribunal que autorice una enmienda o cambio en las constancias del registro? ¿Acaso no es eso lo que el Art. 31 permitía?

Hemos de precisar que los conceptos "rectificaciones", "adiciones" o "enmiendas", según constan en la Ley, deberán ser interpretados dentro del contexto del objeto sobre el cual han de obrarse. El objeto, en nuestro caso, es el certificado de nacimiento. El certificado de nacimiento, por su parte, es un <u>documento histórico</u> que pretende dejar constancia de ciertos datos verificados <u>al momento del nacimiento</u>. El mismo sólo pretende reflejar ciertos datos con certeza en referencia al momento histórico que lo origina.

Por lo tanto, las rectificaciones, adiciones o enmiendas a las constancias del certificado de nacimiento, que un tribunal podía autorizar bajo el artículo 31 de la Ley del Registro Demográfico, según originalmente concebido, sólo podían tener por objetivo dejar constancia certera de un dato, constatable al momento del nacimiento de la persona, omitido o incorrectamente reflejado en el certificado de nacimiento. Cualquier otro dato que no atendiera al momento del nacimiento de la persona, aunque constituyera un asunto de gran trascendencia en la vida de ésta, no podía provocar enmienda alguna al certificado de nacimiento. Por esa razón fue necesaria la acción legislativa enmendatoria del Artículo 31 de la Ley del Registro Demográfico de 1931 para permitir que un tribunal ordenara la inscripción del cambio de nombre o apellido en el certificado de nacimiento.

El tribunal siempre tuvo la autoridad para ordenar corregir un error en el certificado de nacimiento atendiendo a la realidad vital al momento del nacimiento de la persona. Sin embargo, la facultad para autorizar que un hecho posterior al nacimiento sustituyera o enmendara anotaciones previas en el certificado, como es el caso de una persona a quien llamaron "X" al momento de inscribirse, pero que luego se cambió su nombre a "Y" y pretendía que tal nombre fuera sustituido en el

certificado de nacimiento, sólo podía ser conferida al tribunal por medio de enmienda a la ley como ocurrió con los casos de cambio de nombre y apellido o en los casos de adopciones.

En el caso de autos, al momento del nacimiento de la parte recurrente, el 29 de abril de 1950, se constató su masculinidad fenotípica y como tal se hizo constar en el Registro Demográfico. Los padres de la criatura decidieron nombrarla "Andrés" y así se hizo constar en el certificado como un hecho vital histórico. En el 1995, la parte recurrente solicitó y le fue concedido por el tribunal que su nombre fuera cambiado en el certificado de nacimiento en atención a que había adoptado un nombre femenino y a que la Ley del Registro Demográfico fue enmendada para permitir que la categoría "nombre" en el certificado de nacimiento pudiera ser objeto de cambio en sus inscripciones. Tal hecho vital posterior al momento del nacimiento logró su acceso al registro sólo debido a que el legislador autorizó, luego de nuestra decisión en el caso <u>Ex parte Pérez</u>, *ante*, una excepción a la norma general de que el certificado de nacimiento sólo recoge datos en atención al momento del nacimiento. Sin embargo, al solicitar que se inscribiera un cambio en la anotación de "sexo", la parte recurrente ha tenido que enfrentarse al hecho de que aunque afirme sentirse femenina y aunque su cuerpo muestre la apariencia que típicamente exhibe una mujer, la ley <u>no</u> incluye el cambio de sexo como una excepción a la norma general antes expuesta.

No se cometió error alguno al momento en que los funcionarios del Registro Demográfico anotaron en dicho registro, como hecho verificable históricamente, que el día 29 de abril de 1950 nació una persona que exhibía características masculinas y la cual, entre otros datos, fue denominada por sus padres Andrés. No se puede rectificar lo que se ha hecho correctamente; no hay que añadirle nada a lo que está completo; no se puede enmendar lo que no ha sido un error.

La Ley del Registro Demográfico de Puerto Rico, según enmendada, no autoriza al Tribunal General de Justicia a ordenar la anotación en

el Registro Demográfico de un hecho vital que no es constatable al momento del nacimiento de la persona, con excepción de los casos de cambio  de nombre y las anotaciones de cambios que expresamente se autorizan en los casos de adopciones.

IV

Argumenta la parte recurrente que el tribunal sentenciador actuó en violación del Artículo 7 del Código Civil de Puerto Rico, *ante*.  No tiene razón.

En Toppel v. Toppel, 114 D.P.R. 775 (1983), señalamos con referencia a Ef. Litográficos v. National Paper & Type Co., 112 D.P.R. 389, que cuando hay una laguna en la ley el juez no puede dejar de resolver un caso; éste deberá recurrir a la facultad de aplicar los principios de equidad. El caso de marras, sin embargo, no es uno en que se reconozca alguna laguna en la ley o que quede huérfano de regulación jurídica. Debe quedar claro que, a diferencia de lo argumentado por la parte recurrente, la Ley del Registro Demográfico es un estatuto estricto en lo referente a los actos que enumera como justificativos de anotaciones y de cambios a dichas  anotaciones motivados por hechos posteriores al nacimiento e inscripción.

Al diseñar el mandato estatutario de ese modo, la Asamblea Legislativa demostró su intención de excluir cualquier otro derecho que no esté especificado en dicho artículo, ello de acuerdo con la máxima *expressio unius est exclusio alterius*. Cuando en una ley se conceden específicamente ciertas facultades, y no se mencionan otras de la misma categoría, existe un fuerte indicio de la intención legislativa en el sentido de no incluir nada más que lo expresado. Para llegar a una conclusión contraria es necesario que la misma ley demuestre que la intención del legislador no fue limitar las facultades concedidas a las estrictamente enumeradas.[23] El desarrollo de la Ley del Registro

---

[23] Salgado v. Comisión Hípica Insular, 49 D.P.R. 464 (1936).

Demográfico, tanto legislativo como jurisprudencial, niega claramente la posibilidad de aplicarle una interpretación liberal al texto restrictivo de la misma.

V

Por otro lado, la parte recurrente alega tener un derecho constitucional a que se autorice el remedio solicitado.[24]  Invoca el debido proceso de ley y las Secciones 1 y 8 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.[25] No le asiste la razón. No existe un derecho fundamental a que el Estado reconozca que una persona que se somete exitosamente a una "operación de cambio de sexo", como la del caso de marras, deja de ser varón y se convierte en mujer con derecho a constar en el Registro Demográfico como si al momento de su nacimiento biológicamente se hubiera constatado su femineidad.

Es correcto el hecho de que el Tribunal Supremo de los Estados Unidos ha extendido la protección constitucional del Artículo XIV de la Constitución de los Estados Unidos a ciertos derechos e intereses de las personas referentes a su intimidad, a la autonomía de su voluntad y a sus relaciones de familia. Los derechos a la dignidad, integridad personal e intimidad también se han reconocido bajo la Constitución del Estado Libre Asociado de Puerto Rico.  Dichos derechos tienen en Puerto Rico un historial más amplio que el reconocido bajo la Constitución de

---

[24] Menciona, sin argumentar, que se tiene derecho al remedio solicitado "a tenor de los preceptos constitucionales vigentes y del Debido Procedimiento de Ley".

[25] "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley.  No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana." Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.
"Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Sección 8 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.

los Estados Unidos. <u>E.L.A.</u> v. <u>Hermandad de Empleados</u>, 104 D.P.R. 436, 439-440 (1975). Se trata de derechos constitucionales fundamentales que gozan de la más alta jerarquía y constituyen una crucial dimensión en los derechos humanos. Su protección es necesaria para que se pueda lograr una adecuada paz social o colectiva. <u>Arroyo</u> v. <u>Rattan Specialties, Inc.</u>, 117 D.P.R. 35 (1986).

Así pues, hemos reconocido que el derecho a la vida privada y familiar, protegido por las Secciones I y VIII de nuestra Constitución, opera *ex proprio vigore*, y puede hacerse valer entre personas privadas al eximirlas del requisito de acción estatal. Este derecho constitucional impone al Estado y a toda persona el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos. <u>Colón</u> v. <u>Romero Barceló</u>, 112 D.P.R. 250 (1978). En general puede afirmarse que protege dos intereses fundamentales:  uno es el interés individual de evitar la divulgación de asuntos personales, y el otro es el interés de poder tomar decisiones importantes independientemente. <u>Arroyo</u> v. <u>Rattan Specialties</u>, *ante*, pág. 75.

A tenor con lo anterior, tanto en la jurisdicción federal como en la nuestra, se ha reconocido como parte del derecho a la intimidad, la facultad de las personas para tomar decisiones personales o íntimas sin que el Estado intervenga con ellas. Algunas de éstas son la facultad para terminar un embarazo, <u>Roe</u> v. <u>Wade</u>, 410 U.S. 113 (1973); <u>Pueblo</u> v. <u>Duarte</u>, 109 D.P.R. 596 (1980); la de divorciarse sin tener que exponer públicamente la vida íntima, <u>Figueroa Ferrer</u> v. <u>E.L.A.</u>, 107 D.P.R. 250 (1978); la de utilizar anticonceptivos, <u>Griswold</u> v. <u>Conneticut</u>, 381 U.S. 479 (1965); <u>Eisenstadt</u> v. <u>Baird</u>, 405 U.S. 438 (1972); <u>Carey</u> v. <u>Services International</u>, 431 U.S. 678 (1977).

En Puerto Rico se ha reconocido, además, el derecho de la persona a salvaguardar la tranquilidad del hogar, <u>Sucn. De Victoria</u> v. <u>Iglesia Pentecostal</u>, 102 D.P.R. 20 (1974); a proteger a un ciudadano de recibir "un raudal de llamadas indeseables y ofensivas", <u>P.R. Telephone Co.</u> v. <u>Martínez</u>, 114 D.P.R. 328 (1983); o de sufrir continuamente la

exhibición por los medios de comunicación de fotos que constituyan una indebida intromisión en la vida familiar, Colón v. Romero Barceló, *ante*.

Ello no obstante, y como hemos dicho anteriormente, no constituye un derecho constitucional el reconocimiento de un "cambio de sexo" para todos los efectos de la vida social y jurídica de una persona. La parte recurrente no ha demostrado la relación que existe, si alguna, entre el alegado derecho fundamental que ella reclama por un lado, y las relaciones familiares, de matrimonio, de procreación o de la santidad y tranquilidad del hogar, por otro. No procede el reclamo constitucional de la parte recurrente.

VI

Si bien es cierto que la Ley del Registro Demográfico no autoriza la enmienda de la anotación del sexo del inscrito, no queda huérfana de remedio la parte recurrente en su deseo de hacer constar jurídicamente la modificación de su condición como persona, pues nuestro ordenamiento jurídico reconoce la eficacia del expediente *ad perpetuam rei memoriam*. Ya nos expresamos con respecto a este procedimiento en Ex parte Pérez.[26] Allí se aclaró que el propósito del expediente *ad perpetuam rei memoriam* es el de perpetuar la memoria de un hecho acreditando solemnemente ese hecho cuando existe el riesgo de que la prueba del mismo pueda perderse, por la ausencia o muerte de los testigos o por otras razones.

Así, de acuerdo con la Regla 42.2 de las de Procedimiento Civil, la información *ad perpetuam* cabe para perpetuar cualquier hecho, con tal que no resulte perjuicio a una persona cierta y determinada. Si resulta o pudiera resultar perjuicio a alguna persona, no debe admitirse la información. Pero aunque se admita la información, si luego resulta que ésta perjudica a alguna persona carece de efecto en cuanto a ella la providencia aprobatoria.

Una resolución aprobatoria de una información *ad perpetuam memoriam* sin duda ofrece un uso práctico en el caso de autos, tal y como lo señalamos en <u>Ex Parte Pérez</u>, *ante*. Es evidente que una resolución aprobatoria de la información de "cambio de sexo" sería uno de los documentos en que "consten los actos jurídicos que de algún modo modifiquen el estado civil o la condición de la persona inscrita" en el Registro Demográfico.[27]

En atención a tales documentos la Ley del Registro Demográfico dispone en su Artículo 21[28]:

> "A petición de parte interesada, los documentos en que consten los actos jurídicos que de algún modo modifiquen el estado civil o la condición de la persona inscrita, serán archivados en el Departamento de Salud en un archivo especial, haciendo referencia al certificado de nacimiento a que correspondan."

Sin duda, el sexo con que se identifica a una persona es asunto relativo a su "estado civil o condición" y una operación quirúrgica para cambio de sexo es, por consiguiente, un acto con consecuencias modificativas en dicho estado civil o condición que[29], mediado por un *expediente ad perpetuam memoriam*, justificaría su constancia en el <u>archivo especial</u> a que se refiere la Ley del Registro Demográfico.

Reiteramos que en el caso que nos ocupa <u>no</u> corresponde a la Rama Judicial autorizar el cambio de la anotación de sexo en la certificación de nacimiento de la parte recurrente, <u>pues tal acción sería contraria a la letra de la ley y a la intención legislativa</u>. Correspondería a la Rama Legislativa proveer el mecanismo legal para tal fin. Mientras tanto, el expediente *ad perpetuam memoriam* es el único medio jurídico del cual puede disponer la parte recurrente para hacer constar la realidad de sus hechos vitales.

---

[26] 65 D.P.R. 938 (1946).

[27] 24 L.P.R.A. sec. 1135.

[28] *Id.*

[29] Ha dicho García Cantero en relación a una decisión del Tribunal Supremo de España que "[a]ccording to the reasoning of the Court, sex is part of a person's civil status and is an essential feature which is recorded on the birth certificate issued by the doctor present at the

Por las razones antes expresadas es que disentimos _vehementemente_ de la Sentencia mayoritaria emitida en el presente caso.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

---

confinement." *Spain: Sex Change and the Courts*, 29 J. Fam. L. 425 (1990-91).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alexandra M. Andino Torres

Ex-Parte

                         CC-1997-639        Certiorari

Opinión Disidente emitida por el Juez Asociado señor CORRADA DEL RÍO

                    San Juan, Puerto Rico, a 30 de junio de 2000.

                                    I

        En el presente caso, este Tribunal resuelve mediante Sentencia, que la anotación del sexo en el certificado de nacimiento de un transexual es susceptible de enmienda, a tenor de las normas de equidad y de la Constitución del Estado Libre Asociado de Puerto Rico.  Discrepamos de tal dictamen por cuanto la Ley Núm. 24 de 22 de abril de 1931, conocida como la Ley del Registro Demográfico de Puerto Rico, según enmendada, 24 L.P.R.A. sec. 1041 *et seq.*, no admite enmiendas en los certificados de nacimiento, salvo que dicho cambio vaya dirigido a corregir un error u omisión, o en los casos de adopciones y cambio de

nombre expresamente autorizados por ley. También disentimos por entender que no procede autorizar la referida enmienda ya que el certificado de nacimiento es un documento histórico, contentivo de datos vitales de una persona al momento de nacer. Disentimos, además, porque entendemos que una intervención quirúrgica de cambio de sexo es una cirugía meramente cosmética que no produce alteración alguna en la dotación cromosómica del operado, por lo que como cuestión científica y real, no se produce un cambio de sexo.

II

Alexandra M. Andino Torres (en adelante la parte peticionaria) exhibía fenotipo masculino a la fecha de su nacimiento el 29 de abril de 1950. Por tal motivo, en su inscripción en el Registro Demográfico se hizo constar que era del sexo masculino y se le dio el nombre de Andrés Andino Torres.[30] En el año 1976, Andrés se sometió voluntariamente a un procedimiento quirúrgico para lograr un cambio de sexo. Se conduce como si fuera una mujer y utiliza el nombre Alexandra M. Andino Torres, con el cual recurre ante nosotros.

**El 14 de febrero de 1995, la parte peticionaria le solicitó al Tribunal de Primera Instancia que dictase sentencia ordenando al director del Registro Demográfico de Manatí sustituir el nombre masculino que constaba en su certificado de nacimiento por el de Alexandra M. Andino Torres y enmendar la anotación relativa al sexo, para figurar como del sexo femenino.**

La parte peticionaria sometió junto a su petición una copia de los siguientes documentos: certificado de nacimiento; boleto aéreo expedido por American Airlines; identificación de empleo del club deportivo Golf & Tennis World; tarjeta electoral del estado de Nueva Jersey; tarjeta de Seguro Social; Certificados Negativos de Antecedentes Penales expedidos

_____

[30] En Puerto Rico, el artículo 19 de la Ley del Registro Demográfico de Puerto Rico, según enmendada, *supra*, dispone que para inscribir un certificado de nacimiento en el Registro Demográfico se requiere adherir al mismo el certificado de asistencia del médico o comadrona de asistencia, o en su defecto, del padre o la madre o la persona que hizo

por el estado de Nueva Jersey y el Estado Libre Asociado de Puerto Rico; y una certificación de empleo expedida por el Hotel Holiday Inn Boardwalk del estado de Nueva Jersey.

En cuanto al aspecto científico, la parte peticionaria se concretó a someter dos certificaciones médicas de facultativos que no estuvieron disponibles para declarar ante el Tribunal de Primera Instancia. La primera certificación fue preparada por el Dr. J. Randolph Gardner, con despacho en la ciudad de Nueva York. Su certificación tiene fecha de 23 de febrero de 1995 y lee como sigue:

> "Dear Sir/Madam:
>
> This is to verify that the above named patient was examined for sex change in 1976. Examination revealed sex change as so stated. Ms. Torres is a verified transexual [sic] and lives as a woman. (signed by J. Randolph Gardner, M.D.)" (Énfasis en el original.)

Por su parte, la certificación del Dr. Carlos Avellanet, del Centro Gineco-Obstétrico de Manatí, fechada el 26 de enero de 1996, lee así:

> "[c]ertifico por este medio que he examinado a la paciente Alexandra Andino Torres quien fue sometida a una cirugía de cambio de sexo. Certifico que la paciente es una mujer físicamente, y el cambio en el sexo corresponde al de una mujer adulta. Atentamente. (firmado por el Dr. Carlos Avellanet.)"

No obstante lo anterior, la parte peticionaria no presentó evidencia alguna o certificación del cirujano que llevó a cabo la operación de cambio de sexo, Dr. Davis Wessen. No surge de la certificación del Dr. Randolph Gardner cuál es su especialidad. El Dr. Randolph Gardner y el Dr. Carlos Avellanet tampoco han sido cualificados como peritos. Ninguno de los dos estuvo disponible para declarar ante el tribunal de instancia.

El Tribunal de Primera Instancia celebró vista el 23 de mayo de 1996. Surge de la minuta que a la misma comparecieron la parte peticionaria, su representante legal y el Fiscal José Aldrich en representación del Ministerio Público. Se colige, además, que se notificó al Procurador General, pero éste no compareció. Durante la

---

la declaración del nacimiento; allí se hace constar el sexo de la persona al nacer.

vista, el Ministerio Público expresó que la prueba pericial era fundamental para ver el caso. Por su parte, el Tribunal concluyó que la prueba sometida era de referencia, por cuanto el Dr. Randolph Gardner no había mencionado que la parte peticionaria fuese mujer. El Tribunal ordenó al Administrador del Registro Demográfico y al Procurador General a expresarse en torno a la controversia planteada. Señaló una segunda vista para el 4 de septiembre de 1996 y, a solicitud de la parte peticionaria, ordenó citar al Dr. Avellanet a la misma.

Según la minuta del 4 de septiembre, a la vista comparecieron la parte peticionaria y su representación legal. De la misma se desprende que en "este caso se recibió la posición del Departamento de Salud solamente"; y que, ante la inacción de la Fiscalía de Distrito, el Tribunal resolverá de acuerdo a las alegaciones.

El 17 de diciembre de 1996, luego de aquilatar la prueba, el tribunal de instancia dictó resolución ordenando el cambio de nombre. Sin embargo, denegó la inscripción del cambio de sexo, por entender que la legislación vigente no lo permite.

Inconforme, la parte peticionaria acudió ante el Tribunal de Circuito de Apelaciones mediante recurso de apelación, solicitando la revocación de la sentencia recurrida en virtud de la Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Secs. 1 y 8. El 30 de septiembre de 1997, notificada el 7 de octubre, el foro apelativo confirmó el dictamen recurrido. De dicho dictamen comparece ante nos la parte peticionaria formulando los siguientes señalamientos de error:

> "[e]rró el Tribunal sentenciador al declarar NO HA LUGAR al cambio de sexo fundamentando su decisión en que no existía legislación al momento que le permitiese el cambio de sexo en el Registro Demográfico.
>
> Erró el Tribunal al concluir que el certificado de nacimiento es un documento cuyo propósito es exponer las circunstancias al momento del nacimiento y que no puede permitirse para hacer constar un hecho ocurrido posterior a éste.
>
> Erró el Tribunal al señalar que el Artículo 31 de la Ley 24 del 22 de abril de 1931, 24 L.P.R.A. Sección 1231 no provee mecanismo para realizar cambios de sexos en un certificado de nacimiento.
>
> Erró el Tribunal al concluir que para poder adjudicar la controversia sería necesario obviar la ley vigente."

III

El artículo 31 de la Ley del Registro Demográfico de Puerto Rico, según originalmente aprobada, *supra*, disponía que un certificado de nacimiento sólo recoge datos vitales de una persona en atención al

momento de su nacimiento.  Dicha disposición fue enmendada mediante la Ley Núm. 119 de 26 de abril de 1950, Leyes de Puerto Rico, 1950, págs. 304-309, a los fines de autorizar el cambio, adición o modificación de nombre o apellido en el certificado de nacimiento.[31]  En lo pertinente, el cuarto y quinto párrafo del artículo 31, según enmendado, *supra,* dispone que:

> "[e]l auto en que se autorice la rectificación o enmienda de un asiento en el antiguo Registro Civil se inscribirá mediante anotación extendida en debida forma al margen de la inscripción rectificada.  La rectificación, adición o enmienda de un certificado ya archivado en el Registro General Demográfico se hará insertando en él las correcciones, adiciones o enmiendas autorizadas por el tribunal.  Las tachaduras que fueren necesarias se harán de modo que siempre se pueda leer la palabra tachada.
>
> El cambio, adición o modificación de nombre o apellido sólo podrá hacerse a instancia del interesado, quien deberá presentar ante cualquier Sala del Tribunal de Distrito la oportuna solicitud, expresando bajo juramento los motivos de su pretensión, acompañada de la prueba documental pertinente en apoyo de su solicitud. Copia de la solicitud y de toda la prueba documental le será remitida al Ministerio Fiscal simultáneamente con su radicación.
>
> Transcurridos 10 días desde la remisión y notificación al Ministerio Fiscal, sin que éste haya formulado objeción alguna, el tribunal entenderá y resolverá los méritos de la petición sin necesidad de celebrar vista o discrecionalmente podrá celebrar vista de estimarlo procedente y dictará el auto que proceda. El auto en que se autorice el cambio, adición o modificación de nombre o apellido se inscribirá en el antiguo Registro Civil mediante anotación extendida al margen de la inscripción de nacimiento del interesado y al margen de la partida de su

---

[31] La Asamblea Legislativa enmendó dicho artículo a raíz de *Ex Parte Pérez*, 65 D.P.R. 938 (1946), donde resolvimos que, en ausencia de una disposición expresa, no se permitía un cambio de nombre o apellido en el Registro Demográfico.  No obstante lo anterior, allí reconocimos la finalidad del expediente *ad perpetuam rei memoriam* para acreditar hechos en los registros públicos –sin perjuicio de terceros– aun cuando ello no sea suficiente para autorizar una enmienda a las anotaciones del Registro Demográfico.

matrimonio. El cambio, adición o modificación de nombre o apellido se verificará en el Registro General Demográfico tachando en el certificado de nacimiento y en la certificación de la celebración del matrimonio del interesado el nombre o apellido sustituido y consignando el nuevo nombre o apellido autorizado por el tribunal. Las tachaduras se harán de modo que siempre pueda leerse el nombre o apellido suprimida [sic]."

**En cuanto al archivo especial para documentos que modifiquen el estado civil, el artículo 21 dispone que**:

"[a] petición de parte interesada, los documentos en que consten los actos jurídicos que de algún modo modifiquen el estado civil o la condición de la

persona inscrita, serán archivados en el Departamento de Salud en un archivo especial, haciendo referencia al certificado de nacimiento a que correspondan."   24 L.P.R.A. sec. 1135.

En síntesis, la Ley del Registro Demográfico de Puerto Rico, según enmendada, *supra*, no autoriza –ni expresa ni implícitamente– un cambio en el certificado de nacimiento, salvo que dicho cambio vaya dirigido a corregir un error u omisión, o cuando la ley así lo autorice –como es el caso de las adopciones y los cambios de nombre o apellido–.  A fin de cuentas, correspondería a la Rama Legislativa proveer legislación a tales fines, si lo considerara apropiado.[32]

Luego de estudiar detenidamente la Ley del Registro Demográfico de Puerto Rico, según enmendada, *supra,* y en específico los artículos 21 y 31 antes citados, disentimos de la Sentencia de este Tribunal porque entendemos, al igual que el Juez Asociado señor Rebollo López, que el certificado de nacimiento es un documento esencialmente histórico, que

---

[32] En *K. v. Health Div., Dept. of Human Resources*, 560 P.2d 1070 (1977), el Tribunal Supremo de Oregon concluyó que, al crear estatutos, la legislatura de Oregon tuvo la intención de que el certificado de nacimiento fuese un documento histórico contentivo de datos vitales de una persona al momento de nacer. Que tratándose  de un asunto de interés público le competería a la legislatura proveer legislación al respecto. Que no surge de los estatutos vigentes que la legislatura de Oregon haya querido conferirle a la Rama Judicial tal facultad.

contiene datos vitales de una persona al momento de su nacimiento. Los hechos que surgen de un certificado de nacimiento tienen valor probatorio, incluso, constituyen evidencia *prima facie*.[33] Por ende, y en virtud de la confiabilidad que merecen, su corrección goza de interés público para el Estado y los ciudadanos.

Por las razones expuestas, disentimos del dictamen de este Tribunal, y, en su lugar, concluimos que es improcedente en derecho el cambio de sexo solicitado. Aun si ello fuera permisible bajo la ley, tampoco se justifica en el caso de autos. Veamos.

IV

¿Se produjo en el caso de autos, como cuestión de realidad científica, un cambio de sexo en la parte peticionaria?

El hecho de que un transexual[34] se someta a una cirugía de cambio de sexo, puede dar lugar a que surja un contraste entre los elementos genitales externos y el sexo cromosómico y hormonal. Sin embargo, para determinar el sexo de una persona que fue sometida a una intervención quirúrgica de cambio de sexo, no basta con auscultar su físico. Es menester evaluar, además, sus características cromosómicas, hormonales, genéticas y psicológicas.

En Inglaterra, el Juez Ormrod resolvió en *Corbett v. Corbett (Otherwise Ashley)*, 2 All ER 33 (1970), que el sexo de una persona se determina en o antes de su nacimiento, tomando en consideración sus genitales, cromosomas y gónadas, y que tal determinación es inalterable. Al respecto, concluyó que:

---

[33] El artículo 38 de la Ley del Registro Demográfico de Puerto Rico, según enmendada, 24 L.P.R.A. sec. 1237, dispone con relación a las copias certificadas de certificados expedidos por el Secretario de Salud que:

> "[l]a copia del récord de cualquier nacimiento, casamiento o defunción, después que sea certificada por el Secretario de Salud o por la persona autorizada por él, constituirá evidencia prima facie ante todas las cortes de justicia de los hechos que consten en la misma."

[34] El Tribunal Supremo de España definió la transexualidad como "el irresistible sentimiento de pertenencia al sexo contrario, rechazo del propio, y deseo obsesivo de cambiar la morfología genital." Sentencia de 2 de julio de 1987 (Repertorio Aranzadi, núm. 5045), pág. 4832. Véase, además, A. Gordillo Cañas, *Comentario a la Sentencia de 2 de julio de 1987*, Cuadernos Cívitas de Jurisprudencia Civil 4721, 4739 (1987).

"[i]t is common ground between all the medical witnesses that the biological sexual constitution of an individual is fixed at birth (at the latest), and cannot be changed, either by the natural development of organs of the opposite sex, or by medical or surgical means.  The respondent's operation, therefore, cannot affect her true sex.  The only cases where the term 'change of sex' is appropriate are those in which a mistake as to sex is made at birth and subsequently revealed by further medical investigation."

El Tribunal Supremo de España ha señalado que el transexualismo no goza de una solución puramente biológica, ya que los cromosomas del sexo original permanecen inmutables tras una intervención quirúrgica de cambio de sexo.[35]  Indicó, además, que "el varón operado transexualmente no pasa a ser hembra, sino que se le ha de tener por tal por haber dejado de ser varón por extirpación y supresión de los caracteres primarios y secundarios y presentar unos órganos sexuales similares a los femeninos y caracteriologías psíquica [sic] y emocional [sic] propias de este sexo." *Íd.*, pág. 5045. Dicho foro, sin embargo, declaró con lugar una solicitud de cambio de sexo en el certificado de nacimiento de un transexual.[36]

---

[35] Véase, Sentencia de 2 de julio de 1987, *supra*.

[36] Esta decisión del Tribunal Supremo de España ha sido ampliamente criticada.

> Ricardo De Angel Yagüez, Catedrático de Derecho Civil de la Universidad de Deusto considera más convincente el voto particular de los cuatro jueces que se opusieron, al cual nos referimos mas adelante, que la Opinión mayoritaria. Nos comenta que la Opinión mayoritaria por un lado le atribuyó al demandante el sexo femenino y por otro lado se contradijo al concluir que éste, siendo un varón operado transexualmente, no pasó a ser mujer sino que "se le ha de tener por tal." De Angel Yagüez, *Transexualidad y Cambio de sexo; Comentario a la sentencia de 2 de julio de 1987,* 4 Revista Jurídica Española La Ley 166, 182 (1987). Expresa, además, que la Mayoría se percató de los gravísimos problemas sociales y jurídicos que
> **continúa...**

[7] **continuación...**

No obstante lo anterior, los Jueces Santos Briz, Serena Velloso, Pérez Gimeno y Malpica y González-Elipe[37] emitieron voto particular por entender que el ordenamiento jurídico español no autoriza la rectificación de la mención del sexo cuando lo único que se haya tomado en consideración sea el aspecto físico del ser humano, independientemente de un análisis hormonal y cromosomático. En cuanto al factor científico señalaron que:

> "[d]e aquí, cabe partir con seguridad, que si bien hasta determinada edad del individuo puede no aparecer bien definida su personalidad en orden al sexo predominante en él, muchas veces influido por la educación y el entorno en que se desarrolla, está ya en edad adulta bien cristalizada en cuanto que el examen cromosomático del ser humano nos da la pauta de su individualidad sexual hombre o mujer. Estructuralmente, ello es lo que enmarca su condición de varón o hembra y los demás caracteres como son los primarios (órganos sexuales) o secundarios (estatura, color, pilosidad, mamas, voz, etc.), no son sino simples coadyuvantes anatómicos, morfológicos o de hábito e incluso de comportamiento, que, por poder venir mezclados los de distinto signo, o de apariencia externa confusa o equívoca, no pueden estimarse como elementos paradigmáticos para la definición del ser en que se hallan y que los demás observamos y analizamos. **En conclusión, el sexo es cualidad inmanente del ser humano, en tanto que la sexualidad, por referirse al**

---

entrañarían el atribuirle un sexo distinto a quien no lo tiene y, por ende, advirtió que una modificación registral no supone la equiparación absoluta con el sexo contrario. *Íd.*

Jesús Díez del Corral Rivas, Registrador de la Propiedad, Notario y Letrado del Estado comenta que, "[d]a la impresión de que el Tribunal Supremo [de España] ha forzado algo las cosas, aprovechando para dictar su primera decisión sobre la cuestión de fondo del transexualismo un caso no lo suficientemente claro... Existían, en principio, tantas razones como las que concurrieron en la anterior sentencia de 7 de marzo de 1980 para rechazar el recurso fundamentalmente por defectos formales...." Díez del Corral Rivas, *Estado civil y sexo. Transexualidad*, 2 Actualidad Civil 2135, 2156 (1987). Allí mismo añade que, el Derecho no debe obviar las nuevas realidades sociales y los avances de la ciencia, sin embargo, no debe estar sujeto totalmente a los mismos. *Íd.* Según Díez del Corral Rivas, este tipo de caso debe resolverse uno a uno por decisiones judiciales individuales y no de modo global, mediante una ley especial promulgada a esos efectos. *Íd.*, pág. 2157. Por último, expresa su desacuerdo con que se califique como derecho fundamental el derecho del transexual operado a obtener un cambio en la anotación del sexo de su certificado de nacimiento. *Íd.* Véase, además, Gabriel García Cantero, *Spain: Sex change and the courts*, 29 J. Fam. L. 425 (1990-91).

[37] El Tribunal en pleno se integró por trece jueces, de los cuales los cuatro mencionados disintieron del criterio mayoritario.

> comportamiento o conducta del individuo con relación a
> él, es contingente y versátil, no pudiendo constituir
> este último, por consiguiente, factor adecuado para
> cambiar aquél, pues el sexo, aun con componentes
> psico-somáticos tiene, incuestionablemente, un
> ingrediente de carácter físico-biológico, de
> trascendencia infinitamente mayor que el elemento
> psíquico que lo complementa y adorna." (Énfasis
> nuestro.) Sentencia de 2 de julio de 1987, *supra*, pág.
> 4833.

Díez del Corral Rivas, *op cit.,* pág. 2155, nos comenta que "por mucho que una persona se sienta mujer esa circunstancia no puede bastar para fomentar y admitir oficialmente un estado o situación que sólo existe en la psicología del individuo. El libre desarrollo de la personalidad ha de tener unos límites, impuestos por la realidad, so pena de consagrar los comportamientos psicopatológicos del que se sienta la reencarnación de Napoleón, de Buda, o un animal o una planta."

**Sobre el particular, Villagómez Rodil señala que:**

> "[n]os encontramos, en realidad, ante un tercer
> sexo o un sexo no muy bien definido entre masculino y
> femenino pues, si bien puede darse una identidad
> psicológica con el sexo que se adquiere, resulta más
> difícil admitir que alcance la misma cota de plenitud
> en cuanto a la situación física. El nuevo sexo es un
> sexo producido no por la naturaleza, sino por la
> inteligencia del hombre y los avances de la ciencia
> médica. Se trata de un sexo artificial que no alcanza
> a operar y realizar las funciones propias del sexo
> natural, no obstante la opinión científica de que los
> genitales masculinos y femeninos tienen un mismo
> origen embriológico. De ahí que los hombres que se
> mudan no sean aptos para la reproducción. Incluso
> pueden resultar disfuncionadas las relaciones
> sexuales en pareja."[38]

**Allí mismo añade que, "queda en la penumbra de lo ignoto el problema de su personalidad y hasta qué punto su nuevo estado físico ha modificado o superado o se ha adaptado al anterior a la operación. También constituye incógnita la forma de llevarse a cabo la reinserción en ambientes profesionales, laborales y sociales, pues es evidente que la simple modificación legal del estado civil no es suficiente por sí para**

---

[38] A. Villagómez Rodil, <u>Aportación al estudio de la transexualidad</u>, Madrid, Editorial Tecnos, S.A. 1994, pág. 10.

resolver toda la problemática que desencadena la mutación sexual provocada." *Íd.*, pág. 18.

A raíz de diversas solicitudes de cambio de sexo en certificados de nacimiento de transexuales en el estado de Nueva York, la Junta de Salud de dicha ciudad (en adelante la Junta) le solicitó al Comité de Salud Pública de la Academia de Medicina de Nueva York (en adelante el Comité de Salud Pública) el estudio del asunto y la preparación de un informe con sus recomendaciones. Por la complejidad de la materia, el Comité de Salud Pública convocó un grupo de especialistas en las áreas de ginecología, endocrinología, citogenética, psiquiatría y abogacía.

El 4 de octubre de 1965, luego de un análisis riguroso, el Comité de Salud Pública aprobó un informe estableciendo que el certificado de nacimiento de un transexual post-operativo no debe enmendarse a los fines de establecer su nuevo sexo. Sobre el particular expresó que:

> 1) Male-to-female transsexuals are still chromosomally males while ostensibly females.
> 2) It is questionable whether laws and records such as the birth certificate should be changed and thereby used as a means to help psychologically ill persons in their social adaptation. The Committee is therefore opposed to a change of sex on birth certificates in transsexualism.
>
> The Committee would point out that there are other ways to help these persons by: relief by court order to change name and sex, or amendment of the birth certificate by showing the new sex but still showing the original sex and the change of

sex. The desire of concealment of a change of sex by the transsexual is outweighed by the public interest for protection against fraud.[39]

**Así las cosas, la Junta acogió la recomendación del Comité de Salud Pública y resolvió que no procede proveer legislación para permitir la enmienda de un certificado de nacimiento en la anotación del sexo de un transexual. Además, unánimemente decidió que el sexo sólo puede cambiarse en caso de error, y no en un intento por adaptar el sexo físico al psicológico.**

**A raíz de ello, en *Anonymous v. Weiner*, 270 N.Y.S.2d 319 (1966), la Corte Suprema de Nueva York denegó una petición de cambio de sexo en el certificado de nacimiento de un transexual. Dicho foro entendió que el asunto en controversia requería conocimiento especializado, por lo que era necesario ser deferente a la decisión de la Junta.**

Por su parte, Villagómez Rodil nos comenta que el Tribunal Supremo de España ha autorizado la modificación registral de cambio de sexo. Sin embargo, no ha admitido el derecho de los transexuales a casarse bajo el fundamento de que la ley sólo reconoce este derecho a parejas heterosexuales, y partiendo de la premisa de que "la equiparación de sexos no es absoluta."[40] Así, pues, un hombre sometido a una operación para exhibir el fenotipo femenino sólo obtendrá una transformación cosmética. Si tras la operación decide relacionarse sentimentalmente con un hombre, no se les reconocerá como una pareja heterosexual para los fines de matrimonio.[41] Biológicamente, tampoco podrán reproducirse.

Un varón operado no deja de ser varón por extirpación y supresión de los caracteres sexuales primarios. Tampoco deja de serlo, por presentar órganos sexuales similares a los femeninos, al igual que características psíquicas y emocionales propias de dicho sexo. La vagina artificial producto de una cirugía de cambio de sexo es meramente femenina en apariencia; no es funcional para fines

---

[39] The New York Academy of Medicine, *Change of sex on birth certificates for transsexuals*, 42 Bull. N.Y. Acad. Med. 721, 724 (1966).

[40] Villagómez Rodil, *op. cit.*, pág. 21. Véase, además, Sentencia de 19 de abril de 1991 (Repertorio Aranzadi núm. 2725).

[41] El matrimonio es, según definido en el artículo 68 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 221, "una institución civil que procede de un contrato civil en virtud del cual un hombre y una mujer se obligan mutuamente a ser esposo y esposa, y a cumplir el uno para con el otro los deberes que la ley les impone...." (Énfasis suplido.)

reproductivos.[42] En cuanto a los caracteres secundarios, tampoco existe un cambio de sexo real, sino más bien uno artificial, por cuanto los tratamientos con hormonas femeninas son prolongados y, si se suspenden, es muy probable que reaparezcan los caracteres físicos secundarios del sexo masculino.[43]

Por su parte, el factor psicológico determina el carácter y el comportamiento social e individual de un ser humano, pero no altera la realidad científica de su sexo.

En *Anonymous v. Anonymous*, 325 N.Y.S.2d 499 (1971), el demandante presentó demanda de divorcio contra su cónyuge, porque alegadamente éste era hombre para la fecha en que contrajeron matrimonio. Surge de los hechos que la parte demandada nació varón y que, luego de contraer matrimonio con el demandante, se sometió a una intervención quirúrgica de cambio de sexo. La Corte Suprema de Nueva York decretó nulo el alegado matrimonio. Concluyó además que, aun cuando el sexo de la parte demandada hubiese cambiado de hombre a mujer, podría colegirse de los informes médicos que la mera extirpación de los órganos masculinos no es suficiente para realmente convertir a un hombre en una mujer.

En *B. v. B.*, 355 N.Y.S.2d 712 (1974), la peticionaria solicitó la anulación de su matrimonio bajo el fundamento de que su cónyuge era una mujer. El Tribunal Supremo de Nueva York decretó inválido el matrimonio, ya que el recurrido no tenía ningún órgano sexual masculino. Sobre el particular, dicho foro expresó que:

> "[a]ssuming, as urged, that defendant was a male entrapped in the body of a female, the record does not show that the entrapped male successfully escaped to enable defendant to perform male functions in a marriage. Attempted sex reassignment by mastectomy, hysterectomy, and androgenous hormonal therapy, has not achieved that result. The comment by Dr. George

---

[42] Véase, Sentencia de 2 de julio de 1987, *supra*.

[43] Díez del Corral Rivas, *op. cit.,* pág. 2156.

Burou, specialist in male-to-female surgery, who over,

the past fifteen years has performed more than 700

such operations in Casablanca, applies with equal

pertinency to this defendant: 'I don't change men into

women. I transform male genitals into genitals that

have a female aspect. All the rest is in the patient's

mind.' (citation omitted).

...Apparently, hormone treatments and surgery have not
succeeded in supplying the necessary apparatus to
enable defendant to function as a man for purposes of
procreation. In the same way surgery has not reached
that point that can provide a man with something
resembling a normal female sexual organ, transplanting
ovaries or a womb. Those are still beyond reach." *Íd.*,
pág. 717.

Por los fundamentos esbozados, concluimos que el aspecto psicológico y emocional de un ser humano no altera los componentes cromosómicos y genéticos que determinan el sexo. Entendemos, además, que el sexo es una cualidad de la persona. Cuando uno que nació varón asume un rol femenino, es meramente una forma particular de vivir su propia sexualidad. De éste someterse a una operación de cambio de sexo, sólo obtendrá una simple apariencia de cambio de sexo. Tratándose de una cirugía puramente cosmética, sus características genéticas continuarán siendo las de un varón.

Concurrimos con el criterio de los Jueces Santos Briz, Serena Velloso, Pérez Gimeno, Malpica y González-Elipe, el cual establece que, aun cuando la parte peticionaria se sometiera a una operación de cambio de sexo y su morfología externa se aproximara a la del sexo femenino, no ocurrió lo mismo con respecto a la morfología interna.[44] Tomando en consideración que el sexo está en todas las células del organismo, el mismo es inmutable. Aun cuando la parte peticionaria haya logrado una apariencia de mujer mediante tratamientos hormonales e intervenciones quirúrgicas, no por ello adquirirá el sexo femenino.

La mayoría de este Tribunal incide al resolver que procede autorizar el cambio en el renglón del sexo del certificado de nacimiento de una persona que se haya sometido a una intervención quirúrgica de cambio de sexo, de modo que éste refleje la "realidad física". Por el contrario, sostenemos que tal enmienda no procede ya que este tipo de cirugía es meramente cosmética.

---

[44] Sentencia de 2 de julio de 1987 (Voto Particular), *supra.*

Por las razones que anteceden, confirmaríamos el dictamen del Tribunal de Circuito de Apelaciones denegando la rectificación del sexo en el certificado de nacimiento de la parte peticionaria.

El dictamen de este Tribunal es totalmente erróneo en derecho y permite la oficialización de un fraude —el cambio engañoso del sexo de una persona cuando ni la evidencia científica ni la realidad demuestran que tal cambio se ha producido. Ello afecta la veracidad de un documento oficial tan esencial como el certificado de nacimiento, y abre la puerta a posibles engaños.


**BALTASAR CORRADA DEL RIO**
**JUEZ ASOCIADO**