Opinión de conformidad emitida por el
Juez Asociado Se-ñor Martínez Torres,
a la que se une el Juez Asociado Señor Feliberti Cintrón.
In practice, the Living Constitution would better be called the Dead Democracy. (Enfasis nuestro). A. Scalia y B. Garner, Reading Law, St. Paul, Thomson/West, 2012, pág. 410.
*890 Estoy de acuerdo con la Opinión del Tribunal en este caso. Según la ley que rige hoy en Puerto Rico no procede la petición que presentó la señora AAR para adoptar a la menor JMAV. Como discute la Opinión del Tribunal emi-tida por la hermana Jueza Asociada Señora Pabón Char-neco, un análisis textual del Art. 138 del Código Civil de Puerto Rico, según enmendado, 31 L.P.R.A. sec. 539, es lo único que hace falta para arribar al resultado correcto en derecho. Asimismo, la aplicación del escrutinio constitucio-nal aplicable a este caso —el escrutinio de racionalidad mínima— lleva al Tribunal a concluir que el controvertido Art. 138 del Código Civil de Puerto Rico, íd., no padece de vicio constitucional alguno.
Sin embargo, las opiniones disidentes que emiten el Juez Presidente Señor Hernández Denton, la Jueza Aso-ciada Señora Fiol Matta, la Juez Asociada Señora Rodrí-guez Rodríguez y el Juez Asociado Señor Estrella Martínez me obligan a expresarme por separado. En particular, la Opinión del Juez Presidente Señor Hernández Denton, pág. 964, nos invita a “atemperar el ordenamiento jurídico vigente a la realidad extrajurídica de nuestra sociedad”. Lo mismo propone la Jueza Asociada Señora Fiol Matta. Por su parte, la Opinión de la Juez Asociada Señora Rodríguez Rodríguez hace alusión al método de interpretación que postula que nuestra Constitución es un documento vivo y que, por consiguiente, corresponde a los jueces puertorri-queños hacer realidad el supuesto mandato constitucional de impartirle “actualidad” a los derechos individuales. Igual opina la Jueza Asociada Señora Fiol Matta. Para ella, “la ley principal que regula las relaciones de las per-sonas que viven en sociedad no puede congelarse en el tiempo”. Opinión disidente, pág. 999. En sustancia, el Juez Presidente Señor Hernández Denton, la Jueza Asociada Señora Fiol Matta y la Juez Asociada Señora Rodríguez Rodríguez abogan para que en Puerto Rico acojamos como método de interpretación constitucional la llamada teoría *891 de la constitución viva o Living Constitution. Véase D. Strauss, The Living Constitution, Nueva York, Oxford University Press, 2010, págs. 24-25.
Debido a la importancia que reviste este caso en mate-ria de interpretación constitucional y estatutaria, es nece-sario profundizar al respecto.
I
A. Un gran debate académico de actualidad en mate-ria de derecho constitucional es auscultar si una constitu-ción puede evolucionar a la luz de las circunstancias socia-les del momento, o si por el contrario, debe interpretarse en armonía con la forma en que el texto fue entendido por las personas que la aprobaron y la ratificaron. M. Schor, Contextualizing the Debate between Originalism and the Living Constitution, 59 Drake L. Rev 961 (2011). Ese debate se complica ante el hecho de que la mayoría de las constituciones —entre ellas nuestra Constitución de Esta-dos Unidos— no contienen una cláusula escrita que espe-cifique de qué forma deben interpretarla las generaciones posteriores. Id., pág. 964. Ante ese conflicto han surgido dos grandes teorías que, con sus subdivisiones, intentan contestar esa interrogante.
Por un lado, se encuentra la teoría de la “constitución viva” que en esencia postula que cualquier cláusula consti-tucional debe interpretarse a la luz del conocimiento, las necesidades y el modo de vida existentes en el momento en que la decisión sobre la controversia constitucional es resuelta. Véase, en general, Strauss, op. cit. Por otra parte, la teoría del “originalismo” predica la doctrina de que cual-quier cláusula constitucional debe interpretarse de forma tal que se otorguen a las palabras el significado que tenían en el momento en que se adoptó y ratificó la constitución. Scalia y Garner, op. cit., pag. 435.
Una gran crítica que se le realiza a la teoría de la cons- *892 titución viva es que no hay consenso sobre cuál debe ser el principio que guíe la interpretación “viva”. A. Scalia, A Matter of Interpretation: Federal Courts and the Law, Princeton, Princeton University Press, 1997, págs. 44-45. Es de-cir, los defensores de esa escuela de pensamiento coinciden en que la Constitución no es estática, pero difieren entre ellos cuando hay que definir el criterio rector que hace falta para mantener la Constitución “viva”. Íd., pág. 45.
Por esa razón, existen autores que califican la teoría de la constitución viva como una interpretación moral de la Constitución. J.E. Fleming, Living Originalism and Living Constitutionalism as Moral Readings of the American Constitution, 92 B.U.L. Rev. 1171, 1177 (2012). Esa califi-cación se debe al hecho irrefutable de que la aplicación de la teoría de la constitución viva requiere juicios valorativos de moral y teoría política sobre el esquema de principios abstractos y aspiraciones que yacen en la Constitución. Íd., pág. 1178.
El profesor Strauss, exponente ferviente de la teoría de la constitución viva, expresa que no es correcto afirmar que esa teoría concede discreción a los jueces para resolver como se les antoje. D.A. Strauss, Do We Have a Living Constitution?, 59 Drake L. Rev. 973, 976 (2011). Asimismo, indica que la mejor forma de entender esa teoría de inter-pretación constitucional es equiparándola al método de ad-judicación usado en los sistemas en que impera el derecho consuetudinario (common law). Íd., pág. 984. Sin embargo, existen otros académicos que, aunque- acogen la teoría de la constitución viva, no están de acuerdo con la equipara-ción que hace el profesor Strauss. Véase R.L. Brown, Assisted Living for the Constitution, 59 Drake L. Rev. 985, 999-1000 (2011). Según Brown, la interpretación en el de-recho consuetudinario (common law) se ancla por defini-ción en la costumbre mayoritaria. En cambio, la interpre-tación de la constitución viva se rige por principios de justicia que no coinciden necesariamente con lo que la ma-yoría entiende correcto.
*893 Por otro lado, los defensores de la teoría del origina-lismo sostienen que su mayor virtud es que evita que los jueces hagan una lectura moral de la Constitución. Fleming, supra, pág. 1174. Otros autores importantes sostie-nen que el originalismo es la única teoría de interpretación que es compatible con la democracia. Scalia y Garner, Reading Law, op. cit., pág. 82. A diferencia de lo que ocurre según la teoría de la constitución viva, la teoría del origi-nalismo tiene un criterio rector que guía la interpretación: cuál es el significado original de la cláusula constitucional bajo análisis en el momento en que la Constitución se aprobó. Íd., pág. 435.(1)
De igual manera, se ha sentenciado que la teoría del originalismo evita que nueve personas en el Tribunal Supremo, en vez del Pueblo, revisen la Constitución. Scalia y Garner, Reading Law, op. cit., pág. 85. Adviértase que en nuestro esquema constitucional de gobierno los jueces no sientan la política pública que debe imperar en esta jurisdicción. Véanse: Opinión del Tribunal, acápite II; Lozada Sánchez et al. v. JCA, 184 D.P.R. 898, 925-926 (2012). Tampoco son los encargados de consultar la opinión pú-blica para resolver conforme le digan las encuestas sobre el tema en particular. Scalia y Garner, Reading Law, op. cit., pág. 407.
La norma que establece que el Poder Judicial es el en-cargado de ser el intérprete final de la Constitución estriba precisamente en el entendido de que ese documento es una ley, que como tal requiere la interpretación de jueces entre-nados en derecho. Scalia y Garner, Reading Law, op. cit., pág. 408. Esa contención puede entenderse mejor si com-paramos nuestro ordenamiento jurídico con el de Inglate- *894 rra, donde el alcance de su constitución lo determina el Poder Legislativo y no el Judicial. Íd.
Por esa razón, nuestras Constituciones regulan de forma expresa la forma en que se pueden enmendar. Véanse: Art. V de la Constitución de Estados Unidos y Art. VII de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Entonces, si los padres fundadores establecieron un sis-tema riguroso para enmendar la Constitución, no es plausible pensar que ese proceso se puede circunvalar persua-diendo al Tribunal Supremo para que en un caso actualice la Constitución de forma que la mantenga “viva”. Scalia y Garner, Reading Law, op. cit., pág. 409.
El otrora Juez Presidente del Tribunal Supremo de Es-tados Unidos, William H. Rehnquist, sostuvo en un ar-tículo de revista jurídica que ignorar la teoría del origina-lismo
... es una fórmula para esquivar el gobierno popular. En la medida en que se hace posible que un individuo persuada a uno o más jueces federales para imponer a otros individuos una regla de conducta que las ramas electas de gobierno no han promulgado y los electores no plasmaron ni plasmarían en la Constitución, esta versión de la Constitución viva es ver-daderamente corrosiva para los valores fundamentales de nuestra sociedad democrática.(2) (Traducción nuestra). W. Rehnquist, The Notion of a Living Constitution, 54 Tex. L. Rev. 693, 706 (1976).
En armonía con lo expuesto por el Juez Presidente Rehnquist, el Juez Asociado del Tribunal Supremo de Estados Unidos Antonin Scalia sostiene que una consecuencia ne-gativa de la teoría de la constitución viva es que llegue el momento en que a los ciudadanos no les importe que los *895 jueces posean las cualidades de imparcialidad, buen juicio y agudeza legal, sino que solo les interese que los jueces coincidan en el principio rector que mantiene con “vida” la Constitución. Scalia, A Matter of Interpretation, op. cit., pág. 47. El Juez Asociado Scalia opina que cuando ese mo-mento llegue, será el fin de la Carta de Derechos, pues su significado será entregado al mismo grupo del cual se quiere proteger: la mayoría. Id. B. El Art. II, Sec. 19 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 379, indica:
La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos per-tenecientes al pueblo en una democracia, y no mencionados específicamente. Tampoco se entenderá como restrictiva de la facultad de la Asamblea Legislativa para aprobar leyes en pro-tección de la vida, la salud y el bienestar del pueblo. (Énfasis nuestro).
A grandes rasgos, el texto constitucional citado expresa que los derechos que contiene el Art. II de la Constitución, supra, no son los únicos que “pertenece [n] al pueblo en una democracia”. Acto seguido, establece una potestad amplia de la Asamblea Legislativa para aprobar legislación que contenga derechos no especificados en nuestra Carta Magna, a base de los criterios que allí se mencionan. Tam-bién se menciona en esa sección que los derechos reconoci-dos en la Carta de Derechos no se pueden entender de manera restrictiva. Esa concepción es perfectamente compatible con la teoría del originalismo.
La idea central que surge del Art. II, Sec. 19 de la Cons-titución de Puerto Rico, supra, y los tomos 2, 3 y 4 del Diario de Sesiones de la Convención Constituyente, ed. 1961, págs. 1102, 1105, 1623, 2374, 2432, 2449, 2526, 2531 y 2676, es que nuestros constituyentes delegaron en la Asamblea Legislativa —como representantes del Pueblo en nuestro sistema de gobierno— una facultad extensa para crear nuevos derechos mediante legislación, según se en-tienda que son “pertenecientes al pueblo en una democra- *896 cia” y “en protección de la vida, la salud y el bienestar del pueblo”. Como señaló el delegado Jaime Benitez, nuestra Ley Suprema contiene un canon
... de que en la interpretación de estos derechos, no se seguirá una actitud restrictiva, sino que por lo contrario, se las inter-pretará en su plenitud. Y por otra parte, que en la interpreta-ción de estos derechos no se utilizará ninguna de sus cláusulas para menoscabar, para impedir, para maniatar al gobierno en el servicio básico que debe rendir al bienestar, a la salud del pueblo. 2 Diario de Sesiones de la Convención Constituyente de Puerto Rico 1105 (1961).
Así pues, en cada controversia constitucional que se nos presenta debemos interpretar las palabras de nuestra Ley Suprema con profundidad y amplitud. Al presentar a la Convención Constituyente el Informe de la Comisión de la Carta de Derechos, el delegado Jaime Benitez dejó bien claro que la enumeración de derechos en la Constitución no significa “que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional...”. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2576 (1961). Sin embargo, esa interpretación amplia no es carta blanca para que este Tribunal redefina por completo un concepto y añada un derecho que no existe en la Constitución. Scalia y Garner, Reading Law, op. cit., pág. 406. Si así fuera, ¿qué valor tendrían la segunda oración del Art. II Sec. 19 y todo el Art. VII de nuestra Constitución que regula el proceso de enmienda?
Las opiniones disidentes del Señor Juez Presidente y de la Juez Asociada Señora Rodríguez Rodríguez desvirtúan por completo el texto del Art. II, Sec. 19 de la Constitución de Puerto Rico, supra, en un intento de justificar su nueva metodología de adjudicación constitucional. Sin embargo, la citada disposición no le confiere autoridad al Poder Judicial para hacer un acto de alquimia jurídica —al que la disidencia llama una deontología de “sensibilidad artísti-ca” *897 (3)— para crear un derecho constitucional que no existe. Al contrario, en la segunda oración del Art. II, Sec. 19, supra, nuestros constituyentes delegaron en la Asamblea Legislativa y no en este Tribunal la facultad de crear nue-vos derechos del individuo. Lo contrario nos daría un poder omnímodo para constitucionalizar a nuestro antojo toda fa-ceta del quehacer diario de nuestro Pueblo, en negación de la flexibilidad que hace que una constitución sea duradera sin perder su relevancia.
II
La interpretación constitucional que hace la Opinión del Tribunal en el día de hoy utiliza una metodología correcta. En ella, se puede observar la adopción de la teoría del ori-ginalismo como método para interpretar la Constitución de Puerto Rico. Como se desprende de la discusión académica que antecede, la teoría del originalismo es la única meto-dología que respeta nuestro ordenamiento constitucional y hace valer el arraigado principio de separación de poderes que discute con acierto la Opinión del Tribunal.
Sin embargo, la Opinión disidente del Juez Presidente Señor Hernández Denton, pág. 964, concluye que, como “últimos intérpretes de nuestra Ley Suprema, estamos obligados a decretar la inconstitucionalidad del Art. 138 del Código Civil, 31 L.P.R.A. 539, por este incluir una cla-sificación inherentemente sospechosa que discrimina por razón de sexo”. Para cumplir con esa “obligación”, el Señor Juez Presidente realiza una interpretación confusa del tér-mino “sexo”, según aparece en el Art. II, Sec. 1 de la Cons-titución de Puerto Rico, L.P.R.A., Tomo 1. Para ello, el Juez Presidente Señor Hernández Denton recopila una amal-gama de revistas jurídicas que explican cualquier otra *898 cosa excepto la Constitución que se supone que se está interpretando.
La Opinión disidente del Señor Juez Presidente nos pre-senta un problema metodológico de interpretación. Las re-vistas jurídicas que cita el Señor Juez Presidente no inter-pretan, ni de forma remota, la Constitución de Puerto Rico. Asimismo, si se estudian con detenimiento esas fuentes de derecho podemos concluir que entre ellas no hay consenso en cuanto a los términos “sexo”, “género” y “orientación sexual”. Por ejemplo, para Amelia Craig, el discrimen por razón de “sexo” y por razón de “orientación sexual” son mo-dalidades del discrimen por razón de “género”. A.A. Craig, Musing about Discrimination Based on Sex and Sexual Orientation as “Gender Role”Discrimination, 5 S. Cal. Rev. L. & Women’s Stud. 105 (otoño 1995). No obstante, esa posición tropieza con el criterio de Andrew Koppelman, quien sostiene que el discrimen por razón de “orientación sexual” es una modalidad del discrimen por razón de “sexo”. A. Koppelman, Defending the Sex Discrimination Argument for Lesbian and Gay Rights: A Reply to Edward Stein, 49 U.C.L.A. L. Rev. 519 (2001).
La opinión disidente nos embarca en un viaje circular por una ruta panorámica. Señala en la primera curva “que el discrimen por razón de orientación sexual es una moda-lidad de discrimen por razón de sexo” (pág. 979) y en la segunda vuelta concluye “que el discrimen por razón de orientación sexual y el discrimen por razón de sexo son realmente discrimen por razón de género”, (pág. 980). De ahí concluye, no que el término “género” incluye “sexo”, que a su vez incluye “orientación sexual”, sino que sexo, género y orientación o preferencia sexual son lo mismo. En su in-tento por fundir conceptos y criterios disímiles, la opinión disidente omite que esos términos no son sinónimos (como reconoció primero) y que la Constitución de Puerto Rico no se refiere a la categoría más inclusiva de “género” y mucho menos a la subcategoría de “orientación sexual”. El docu- *899 mentó se circunscribió a prohibir el discrimen por la cate-goría más limitada del “sexo”, es decir, por ser hombre o mujer.
Sin lugar a dudas, la metodología que utiliza el Juez Presidente Señor Hernández Denton para llegar a su re-sultado “actualizado” es afín a la teoría de la constitución viva. Cónsono con lo anterior, el Juez Presidente Señor Hernández Denton propone que donde los delegados a la Asamblea Constituyente escribieron “sexo” se entienda que, de ahora en adelante, se incluirán también las moda-lidades de “género” u “orientación sexual”.
Para ello, el Señor Juez Presidente formula una serie de juicios valorativos que a este Tribunal no le corresponde contestar. Por ejemplo, la cita del Presidente Barack Obama con la que el Señor Juez Presidente comienza su opinión disidente no va dirigida a los tribunales y demues-tra precisamente que no es el Poder Judicial el encargado de contestar las interrogantes que formula la disidencia, sino las ramas políticas del Gobierno, es decir, el Poder Legislativo y el Poder Ejecutivo.
Lo que nos corresponde como foro imparcial ajeno a las controversias políticas es asegurar la estabilidad de nues-tras decisiones y respetar la división de poderes que la Constitución diseñó. En eso la disidencia no ha sido firme. Como se recordará, en Andino Torres, Ex parte, 151 D.P.R. 794 (2000), este Tribunal emitió una sentencia que permi-tió que una persona cambiara el sexo en su certificado de nacimiento. Esa sentencia contó con el voto de conformidad del entonces Juez Asociado Señor Hernández Denton. In-cluso, el hoy Juez Presidente se unió a la opinión concu-rrente que emitió el Juez Asociado Señor Negrón García. Esa opinión concurrente fundamentó la decisión de permi-tir el cambio de sexo en el “fundamental axioma [de] que Ta dignidad del ser humano es inviolable’ ”. Id., pág. 807. (Opinión concurrente del Juez Asociado Señor Negrón Gar-cía, a la que se unieron los Jueces Asociados Señores Her- *900 nández Denton y Fuster Berlingeri). También se sustentó el resultado en la protección de ley contra ataques abusivos a la honra, a la reputación y a la vida privada o familiar, según consagrada en el Art. II, Sec. 8 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.
Sin embargo, en Delgado, Ex parte, 165 D.P.R. 170 (2005), ante una situación de hechos idéntica a la que se atendió en Andino Torres, ex parte, supra, el Juez Presi-dente Señor Hernández Denton varió de ruta y votó con-forme con la Opinión del Tribunal que, por voz de la Juez Asociada Señora Rodríguez Rodríguez, denegó la petición de una persona para cambiar su sexo en su certificado de nacimiento. De hecho, el Juez Asociado Señor Fuster Ber-lingeri disintió de manera ferviente y puntualizó la gran inconsistencia que demostró el Tribunal, y en especial el Juez Presidente Señor Hernández Denton, en ese caso. Véase Delgado, Ex parte, supra, págs. 202-208. (Opinión disidente del Juez Asociado Señor Fuster Berlingeri).
En síntesis, en este viaje panorámico la postura del Se-ñor Juez Presidente ha tomado varias curvas a través del tiempo. Así, en Andino Torres, ex parte, supra, el Señor Juez Presidente encontró una violación constitucional, mientras que en Delgado, Ex parte, supra, no encontró ninguna. Ahora el Señor Juez Presidente encuentra una violación constitucional, aunque no de la misma cláusula.
Por supuesto, no hay nada malo en cambiar de parecer si uno se convence de que está equivocado. El problema es que el criterio zigzagueante es característico de la metodo-logía de la constitución viva y responde a la ausencia de un criterio rector a la hora de interpretar la Constitución. Ello resulta en una adjudicación judicial muy subjetiva que no brinda certeza legal. Al respecto, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:
*901 V. S[É] IMPARCIAL
El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasio-nes, por temor o misericordia. La imparcialidad implica el co-raje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil. J.C. Mendonca, Los Mandamientos del Juez, 7 (Núm. 1) Forum 34 (1991). Lozada Sánchez et al. v. JCA, supra, pág. 926.
Es muy fácil disfrazar el deseo de imponer un criterio moral sobre este asunto complejo con el pretexto de que se “trata de tener sensibilidad ante los problemas reales que enfrentan las personas...”. Opinión disidente del Juez Pre-sidente Señor Hernández Denton, pág. 975. Es necesario que todos los jueces empleen mucha sensibilidad cuando resuelven y explican a la parte perdidosa, por conducto del fallo judicial, por qué su reclamo no tiene mérito. En ese aspecto la sensibilidad es importantísima. Ahora bien, ni en la Constitución de Puerto Rico ni en el Código Civil he encontrado un canon de interpretación que permita a los jueces decidir a base de simpatías personales. Quién sabe, tal vez se halla en “un pergamino arcaico conservado en un monasterio de monjes cartujos...”. Opinión disiente del Juez Presidente Hernández Denton, pág. 993. Cuando lo encuentre, podré justificar el activismo judicial al cual hoy nos pretende llevar la disidencia.
III
Por su parte, la Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 1036 y 1037, razona que, con “honestidad intelectual”, es necesario concluir que nuestras “cláusulas constitucionales no son prisioneras del tiempo”. Al contrario, sostiene que para “preservar” la Constitución es necesario actualizar sus cláusulas a las ne-cesidades de los tiempos. Íd. De esa forma, la colega Juez *902 Asociada no tiene problema para imponer su criterio moral para determinar unilateralmente cuáles son las necesida-des de los tiempos y enmendar la Constitución para que donde dice “sexo” diga “orientación o preferencia sexual”. Véase Art. II, Sec. 1 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1.
De igual modo, la Jueza Asociada Señora Fiol Matta propone dos enfoques disímiles para llegar al resultado deseado. Primero, invoca la doctrina de “autolimitación judicial” para importar la figura de second parent adoption. Luego, adopta la doctrina contraria de activismo judicial para declarar inconstitucional la clasificación por “género” que ella identifica en el Art. 138 del Código Civil, supra. A su juicio, no hacerlo significaría “convertí [rnos] en un obs-táculo en lugar de una herramienta de justicia” (pág. 1000) por “[p]ensar que la Legislatura ya ha dado todas las res-puestas a las controversias novedosas que se nos presen-tan con el pasar de los años...”.
A diferencia de las opiniones disidentes, opino que a los individuos que integran este Foro no les corresponde impo-ner su criterio moral en las decisiones que emiten. Es co-rrecto que la Asamblea Legislativa no ha dado todas las respuestas atinentes a la controversia que nos ocupa, pero ello no quiere decir que no vaya a hacerlo. Es a la Asam-blea Legislativa de Puerto Rico que le corresponde impar-tir “actualidad” al Art. 138 del Código Civil, supra, y apro-bar un proyecto de ley a esos efectos, si esa es su voluntad. Sus manos están libres para acoger la solución que pro-pone la parte peticionaria, enmendar la ley y permitir la adopción que aquí se solicita.
En el escolio 36 de su disenso, la Juez Asociada Señora Rodríguez Rodríguez señala que aun si se realiza un aná-lisis originalista de la Constitución, se alcanzaría el mismo resultado que ella postula. Si esa aseveración es correcta, ¿por qué entonces tanto el Juez Presidente como las Juezas *903 Asociadas Señoras Fiol Matta y Rodríguez Rodríguez ha-cen referencia constantemente a la teoría de la constitu-ción viva? ¿Por qué no se refieren al término “sexo”, según lo entendían nuestros constituyentes? La contestación es sencilla. El originalismo bien aplicado no lleva a la conclu-sión que la Juez Asociada Señora Rodríguez Rodríguez prefiere. Solo la teoría de la constitución viva permite que las preferencias morales de la Juez Asociada y el resultado del caso estén en sintonía.
La adopción de lá metodología adjudicativa de la “cons-titución viva” genera un sinnúmero de interrogantes para nuestra profesión legal. Después de todo, la jurisprudencia que este Foro pauta busca servir de guía para casos futuros. Ahora bien, si aplica la metodología de la consti-tución viva, ¿cuál es la necesidad del momento que el Tribunal va a atender como principio rector? Más aún, ¿cómo llegará el Tribunal a su conclusión? ¿Quién determina cuál es esa necesidad del momento?
Al parecer, la Juez Asociada Señora Rodríguez Rodrí-guez escogerá “la necesidad del momento” sujeto al resul-tado al que quiera llegar. Esa actuación de la Juez Aso-ciada Señora Rodríguez Rodríguez dista mucho de la “visión positivista hartiana de lo que es el Derecho consti-tucional puertorriqueño” y de la adjudicación “formalista [d]el texto o la interpretación de éste” que la caracterizaba antes del 10 de marzo de 2009. C. Saavedra Gutiérrez y P.K. García Rivera, La uniformidad en el Derecho: Análisis de la metodología adjudicativa de la Juez Asociada Anabelle Rodríguez Rodríguez, 80 Rev. Jur. U.P.R. 203, 213 (2011).
En lo único que coincido con la Juez Asociada Señora Rodríguez Rodríguez es que “urge que despojemos las pro-pias visiones morales del ejercicio judicial”. Opinión disi-dente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1064. Ese acto de despojo jurídico se manifestó corree- *904 tamente en Delgado, Ex parte, supra. Allí sostuvimos, pre-cisamente por voz de la Juez Asociada Señora Rodríguez Rodríguez, que la Ley del Registro Demográfico establecía las únicas instancias en que se podían realizar cambios en las anotaciones de las circunstancias vitales de las perso-nas en su certificado de nacimiento. Id. Debido a esa limi-tación, concluimos que no procedía enmendar jurispruden-cialmente la ley para permitir a un transexual cambiar su sexo en su certificado de nacimiento. Id., págs. 191-192. De forma muy sabia, la Opinión de la Juez Asociada Señora Rodríguez Rodríguez expresó que “le corresponde a la Asamblea Legislativa sopesar todos los intereses involu-crados en la controversia que trasluce el tema” para propo-ner respuestas a un caso como este. Id., pág. 193. Sin embargo, hoy la Juez Asociada emite un disenso con fundamentos parecidos a los que no le convencieron en Delgado, Ex parte, supra.
La Juez Asociada intenta despachar en el escolio nueve de su disenso la inaplicabilidad de lo resuelto en Delgado, Ex parte, supra. Para ello sostiene que en ese caso “no se presentaron planteamientos constitucionales para susten-tar el reclamo de la peticionaria ante esta Curia”. (Enfasis suprimido). Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1007 esc. 9. Sin embargo, la opi-nión disidente que emitió la Jueza Asociada Señora Fiol Matta en Delgado, Ex parte, supra, pág. 224, expresó con nitidez que la allí peticionaria
... se ampar[ó] en nuestra Ley Suprema, la Constitución del Estado Libre Asociado de Puerto Rico, para reclamar su dere-cho a la intimidad y dignidad, a la vez que se refi[rió] a nues-tra sentencia en Andino Torres, ex parte, supra, y varias sen-tencias españolas, con ánimo de persuadirnos a reiterar el criterio que adoptamos entonces.
Del párrafo transcrito surge que en Delgado, Ex parte, supra, sí hubo un planteamiento constitucional que la Opi-nión del Tribunal, emitida por la Juez Asociada Señora Ro- *905 dríguez Rodríguez, ignoró. Allí la Juez Asociada caminó por la historia no “exhibiendo absolutos”, sino ocultándolos como si no existieran. Opinión disidente de la Juez Aso-ciada Señora Rodríguez Rodríguez, pág. 91. Al parecer, en ese momento transitaba por “el lado [in] correcto de la his-toria...”. íd., pág. 90.
En suma, estoy conforme con el análisis constitucional de la Opinión del Tribunal. El Art. VII de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, contiene un procedi-miento riguroso que hay que seguir para consultar a nues-tro Pueblo si desea enmendar su Carta Magna. No está dentro de mis funciones enmendarla. Dicho de otro modo:
... la noción de que los defensores de la teoría de la constitu-ción viva quieren brindarnos flexibilidad y apertura al cambio es un fraude y un engaño. Lo único que se necesita para tener flexibilidad y apertura al cambio es una urna electoral y una legislatura. (Traducción nuestra).(4) Scalia y Garner, Reading Law, op. cit., pág. 410.
> h — I
Por su parte, la Opinión disidente del hermano Juez Aso-ciado Señor Estrella Martínez se adentra en un análisis au-daz del Art. 138 del Código Civil, supra, que en su aplica-ción, elimina de un plumazo el conjunto de palabras clave para resolver este caso. En ello se diferencia de las otras opiniones disidentes, que reconocen que la ley dice lo que dice. Toda la tesis de la Opinión disidente del Juez Asociado Señor Estrella Martínez se sustenta en ignorar el Art. 138, supra, y así, obviar la diferencia entre adoptandos con fami-lia anterior y aquellos que provienen de una única filiación. Un análisis integrado de nuestro Código Civil es lo único que hace falta para demostrar la imposibilidad de esa tesis.
*906 El Art. 133 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 534, dispone con claridad que “[n]adie podrá ser adop-tado por más de una persona, salvo que los adoptantes estuviesen casados entre sí en cuyo caso se deberá adoptar conjuntamente”. De esa forma, en esta jurisdicción solo procede una adopción conjunta si los adoptantes están ca-sados entre sí. Como se recordará, el Art. 68 del Código Civil, 31 L.P.R.A. sec. 221, indica que un matrimonio vá-lido es aquel habido entre un hombre y una mujer. El ci-tado Art. 68 no permite que dos personas del mismo sexo contraigan matrimonio. En consecuencia, el derecho vi-gente impide que dos personas del mismo sexo puedan adoptar conjuntamente.
En cuanto a la adopción individual, basta echar un vistazo al Art. 138 del Código Civil, supra, que dispone diáfa-namente que para que ella proceda, el adoptante tiene que ser de distinto sexo al del padre o madre que ha reconocido al adoptado. Como se aprecia, la Asamblea Legislativa de Puerto Rico ha decidido que dos personas del mismo sexo no pueden adoptar conjuntamente, ni uno de ellos puede adoptar al hijo del otro.
Ahora bien, el Juez Asociado Señor Estrella Martínez nos invita a ignorar el texto del Art. 138, supra, lo que conllevaría a que en efecto, se lea así:

See. 539. Subsistencia del vínculo con la familia anterior.

No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o ma-terna anterior subsistirán cuando el adoptado sea hijo del cón-yuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de-distinto-se-xo al dcl-padrc-o-madre-que lo ha rcco nocido come-su hijo.
La ruptura y extinción de los vínculos jurídicos con la fami-lia anterior del adoptado, y el nacimiento de tales vínculos con la familia del adoptante, se entenderán sin perjuicio de la re-glamentación sobre impedimentos y prohibiciones de ley para contraer matrimonio en Puerto Rico. Un adoptado no podrá contraer matrimonio con un pariente de su anterior familia, *907 en los mismos casos en que no hubiere podido contraerlo de no haber ocurrido la adopción.
La responsabilidad penal del adoptado en los delitos contra la familia y el estado civil seguirá siendo la misma que dis-pone el ordenamiento jurídico vigente, en relación a su familia biológica anterior, tal y como si no se hubiere decretado la adopción, si se probare que el adoptado conocía de su vínculo familiar con la víctima del incesto.
El adoptado adquirirá los apellidos del adoptante o los cón-yuges adoptantes, salvo que el tribunal, por causa justificada, determine otra cosa.
Desconozco con qué autoridad constitucional podemos tachar la frase indicada. Eso explica por qué de entre nueve integrantes de este Tribunal, tres jueces del Tribunal de Apelaciones y una del Tribunal de Primera Instan-cia que atendieron este caso, las partes y nueve amigos de la corte (amicus curiae), solamente el hermano Juez Aso-ciado Estrella Martínez interpreta que el Art. 138 del Có-digo Civil, supra, no aplica.
De hecho, durante el proceso de confirmación ante el Senado de Puerto Rico, el hoy Juez Asociado Señor Estrella Martínez expresó que
... tiene una visión clara de la separación de poderes. Asimismo, manifestó que es fiel a la Ley. De otra parte el designado indicó que la función de un juez no es hacer leyes, sino aplicar el de-recho vigente. Considera que tiene la autodisciplina requerida para aplicar la voluntad legislativa y no usurpar el poder inter-pretando de una forma contraria al mandato de ley.
El Ledo. Luis F. Estrella Martínez concluyó expresando que de ser confirmado como Juez del más alto foro, aplicará el derecho y no [va] a sustituir criterios legislativos. Informe en torno a la consideración del nombramiento del Ledo. Luis F Estrella Martínez para el cargo de Juez Asociado del Tribunal Supremo de Puerto Rico, en sesión celebrada el 11 de mayo de 2011, pág. 5.
Me hago eco de esas expresiones y acojo el buen consejo del compañero Juez Asociado Señor Estrella Martínez en su vista de confirmación.
Precisamente, como señala el Señor Juez Presidente en su opinión disidente, la Asamblea Legislativa ha rechazado *908 propuestas para consignar en el Código Civil la figura de la segunda madre o el segundo padre funcional (second parent adoption) que proponen la Jueza Asociada Señora Fiol Matta y el Juez Asociado Señor Estrella Martínez. Véase el historial legislativo de la Ley Núm. 8-1995, que enmendó el Art. 138 del Código Civil, supra. Aun así, se insiste en ignorar la voluntad legislativa para nosotros “legislar” me-diante opinión la enmienda que el legislador rechazó.
Por eso me parece desafortunado que el compañero Juez Asociado Señor Estrella Martínez nos impute olvidarnos de la menor y su bienestar. Nada más lejos de la realidad. Como señalamos en Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 756 (2001), “los requisitos sustantivos para cualificar como adoptante son jurisdiccionales, por lo que el incumplimiento de uno solo de ellos priva de jurisdicción al Tribunal”. Véanse, además: Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999); M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910, 921 (1989); Ex parte Warren, 92 D.P.R. 299 (1965). De esa forma, solo “si se cum-plen los requisitos sustantivos, entonces el tribunal puede valerse de su discreción para autorizar o no autorizar la adopción, procurando siempre el bienestar del menor”. (Enfasis suplido). Virella v. Proc. Esp. Rel. Fam., supra, págs. 759-760. Añadimos que “[rjesolver lo contrario sin duda constituiría una usurpación del poder legislativo”. Id. Véase, además, Pérez, Román v. Proc. Esp. Rel. de Fam., supra, págs. 209-210.
Ante el análisis inefable que realiza la Opinión disi-dente del Juez Asociado Señor Estrella Martínez es nece-sario recordar la norma trillada de este Foro de que “como cuestión de umbral es menester remitirnos al texto de la ley”. Lilly del Caribe v. CRIM, 185 D.P.R. 239, 252 (2012), citando a Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 245 (2010). Así pues, “cuando el legislador se ha manifes-tado con un lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa”. *909 Íd., pág. 244. Véanse, además: Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; Lilly del Caribe v. CRIM, supra; Rosario v. Dist. Kikuet, Inc., 151 D.P.R. 634, 643 (2000). “La distinción de las leyes en odiosas o favorables, con el propósito de restringir o extender sus disposiciones, no puede ser hecha por aquéllos cuyo deber es interpretarlas”. Art. 21 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 21.
Como se aprecia tras una lectura del Art. 138 del Código Civil, supra, el legislador estableció como requisito sustan-tivo que en la adopción de vínculo sencillo el adoptante sea una persona de distinto sexo al del padre o la madre inscrito. Dado que ese requisito jurisdiccional no se cumple en este caso, es innecesario entrar a dilucidar el elemento del mejor bienestar del menor. Virella v. Proc. Esp. Rel. Fam., supra, pág. 756. Toda la discusión que hace la Opi-nión disidente del Juez Asociado Señor Estrella Martínez al respecto constituye puro dictum. Ortiz Chévere et al. v. Srio. Hacienda, 186 D.P.R. 951 (2012); Ortiz v. Panel F.E.I., 155 D.P.R. 219, 252 (2001).
V
De todos modos, debe quedar bien claro que lo que se está denegando es una solicitud de adopción en uno de los vínculos. La madre de la menor seguirá siéndolo. La menor seguirá viviendo en el mismo hogar, en compañía de las peticionarias, y seguirá recibiendo el cuidado y cariño que sin duda ha recibido hasta ahora.
El único asunto ante nuestra consideración es si la ley de adopción vigente provee la alternativa para que dos per-sonas del . mismo sexo adopten a la menor. Los tres foros judiciales que vieron el caso contestaron que no. Las peti-cionarias plantearon que esa respuesta es inconstitucional. La Opinión del Tribunal explica por qué las peticionarias se equivocan.
*910 Al resolver esas interrogantes el Tribunal se circunscri-bió a su deber constitucional de decidir cuál es la ley. No la reescribió, no la enmendó ni varió su significado. Así, el Tribunal ha demostrado un respeto profundo a la democra-cia y ha dejado en manos del Pueblo de Puerto Rico arribar a un consenso social y político en temas tan delicados como la adopción por parejas de un mismo sexo.
Comprendo la impaciencia de muchas personas para que se reconozca la facultad de adoptar en circunstancias como la de este caso. Se trata de cuestiones profundamente emocionales que desatan pasiones enormes. Sin embargo, eso no crea una violación de la Constitución ni nos faculta a intervenir para escoger una solución de acuerdo a nues-tras preferencias morales.
En lo personal, simpatizo con la posición de las peticionarias. No tengo la menor duda de que sería mejor permitir la adopción por una pareja hábil del mismo sexo, ansiosa por brindar amor y un hogar a un menor, que con-denarle a pasar su niñez en un orfelinato, o de hogar de crianza en hogar de crianza. Respeto la posición moral de los que piensan distinto a mí. Sin embargo, mi compromiso con el mejor bienestar de los menores me lleva a aceptar a las personas homosexuales o lesbianas como adoptantes en igualdad de condiciones que las personas heterosexuales. No obstante, la Constitución no me autoriza a imponer mi preferencia moral a toda la sociedad.
La longevidad de nuestro esquema constitucional es-triba en que la Constitución es un documento redactado para atender los principios generales y no los detalles de cada actuación gubernamental. Eso permite que los repre-sentantes electos por el Pueblo experimenten con nuevas leyes y las adapten a las ideas cambiantes de la sociedad. Permitir que ese proceso fluya no nos convierte en un “obstáculo”. Por el contrario, si interferimos y abortamos ese proceso democrático seríamos un estorbo público.
*911 El Tribunal Supremo de Estados Unidos resumió muy bien esa idea en palabras del Juez Asociado Oliver Wendell Holmes:
Aunque los tribunales deben ejercer su juicio propio, ello no significa en modo alguno que es nula toda ley que a los jueces que la interpretan les parezca excesiva, que no se ajusta a su fin ostensible o que se base en conceptos de moralidad con los que ellos estén en desacuerdo. Debe permitirse también una latitud considerable para las condiciones peculiares que son posibles y que este Tribunal puede que acaso conozca, aunque imperfectamente. De lo contrario, una constitución, en vez de encarnar solamente unas reglas de derecho fundamentales, según se entienden generalmente... se convertiría en partida-ria de un conjunto particular de opiniones éticas o económicas, que en modo alguno se comparten semper ubique et ab omnibus. (Traducción nuestra).(5) Otis v. Parker, 187 U.S. 606, 608-609 (1903).
Ausente una violación de la Constitución, corresponde a las ramas políticas del Gobierno atender este asunto cuando lo crean conveniente y estimen necesario. A eso instó el Presidente Obama en su discurso inaugural. Así se ha hecho en muchos estados. Nada impide que en Puerto Rico suceda lo mismo. Esa es la salida democrática que permite que la sociedad llegue a un consenso sobre este asunto tan delicado. Lo contrario sería la imposición de una norma desde este estrado, sin que necesariamente tenga el apoyo de la sociedad. Aun así, esa nueva regla sería inmutable. Por eso, ello podría conducir a que este Tribunal pierda la credibilidad ante un pueblo que con ra-zón lo vería como el usurpador de su derecho democrático a *912 regir su vida y determinar las leyes que rigen en esta ju-risdicción así como los cambios que deben hacerse.
Si nuestra sociedad está preparada para aceptar las adopciones por parejas del mismo sexo, si ha llegado el momento de permitirlo, entonces corresponde a la Asam-blea Legislativa adoptar legislación en ese sentido para que esa sea la norma una vez el Gobernador le imparta su firma. Ningún formalismo legal lo impide. Es una cuestión de voluntad política de la que a este Tribunal no le corres-ponde opinar y mucho menos intervenir.
— O —

 Existe un debate académico muy interesante sobre la diferencia entre la intención original y el significado original a la hora de interpretar una Constitución o una ley. Véanse: Á. Scalia y B. Garner, Reading Law, Thomson/West, 2012, págs. 82 y 391-396; A. Reed Amar, On Text and Precedent, 31 Harv. J.L. & Pub. Pol’y 961, 963 (2008).

 El texto original en inglés establece: “is a formula for an end run around popular government. To the extent that it makes possible an individual’s persuading one or more appointed federal judges to impose on other individuals a rule of conduct that the popularly elected branches of government would not have enacted and the voters have not and would not have embodied in the Constitution, this... version of the living Constitution is genuinely corrosive of the fundamental values of our democratic society”.

 Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1035 esc. 34.

 El texto original en inglés es el siguiente: “And the notion that the advocates of the Living Constitution want to bring us flexibility and openness to change is a fraud and a delusion. All one needs for flexibility and change is a ballot box and a legislature”.

 El texto original en inglés es el siguiente: “While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right as generally understood... would become the partisan of a particular set of ethical or economical opinions, which by no means are held semper ubique et ab omnibus”.